**LEVIN SIMES ABRAMS LLP**
Rachel Abrams (SBN 209316)
Amanda J.G. Walbrun, Esq. (SBN 317408)
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile:  (415) 426-3001
Email: rabrams@levinsimes.com
Email: awalbrun@levinsimes.com

**BABIN LAW, LLC**
Steven C. Babin, Jr., Esq. (*pro hac vice forthcoming*)
(Ohio SBN 0093584)
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
Telephone: 614-761-8800
Facsimile:  (614) 706-1775
Email: steven.babin@babinlaws.com

*Attorneys for Plaintiff J.M.*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.M., an individual, | Case No. |
| Plaintiff | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| CHOICE HOTELS INTERNATIONAL, INC.;  AND RED ROOF INNS, INC. | |
| Defendants. | |

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

## COMPLAINT

COMES NOW the Plaintiff J.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments against CHOICE HOTELS INTERNATIONAL, INC. ("Choice"); and RED ROOF INNS, INC. ("Red Roof Inn").

## INTRODUCTION

1.      Human trafficking is the world's fastest growing crime.[1] The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of **all** illegal drugs.[2]

2.      The covert nature of human trafficking makes it difficult to determine how many victims this trade in human misery has affected, but the International Labor Organization estimates there are roughly 40 million victims of human trafficking globally, with perhaps hundreds of thousands in the United States.[3]

3.      The American Hotel Industry's apathy towards human trafficking has allowed human trafficking in the United States to flourish. A recent survey of survivors who called the National Human Trafficking Hotline conducted by the nonprofit Polaris project found that sixty percent (60%) of those who responded had been forced to engage in commercial sex within the confines of a hotel or motel during their trafficking, and seventy-five percent (75%) had stayed in a hotel or motel during travel or otherwise directly encountered a hotel or motel at some point during their trafficking.[4]

4.      Given the prevalence and profitability of sex trafficking and given the high proportion of sex trafficking that occurs in rooms rented to traffickers by the Hotel Defendants and

---

[1] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

[2] *Profits and Poverty: The Economics of Forced Labor*, INTERNATIONAL LABOR ORGANIZATION (May 24, 2014), http://www.ilo.org/global/publications/ilo-bookstore/order-online/books/WCMS_243391/lang-- en/index.htm.

[3] *Global Estimates of Modern Slavery*, INTERNATIONAL LABOR ORGANIZATION (Sep. 19, 2017), http://www.ilo.org/wcmsp5/groups/public/---dgreports/---dcomm/documents/publication/wcms_575479.pdf

[4] *On-Ramps, Intersections, and Exit Routes*, POLARIS     (2018),     https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-   Hotels-and-Motels.pdf.

1   other members of the hospitality industry for that purpose, the hospitality industry as a whole, and

2   the Hotel Defendants in particular, enjoy significant revenues from their provision of services to the

3   human trafficking industry, likely in the hundreds of millions or billions of dollars per year.

4         5.      Defendants and other members of the hospitality industry are and have long been

5   aware of the prevalence of human trafficking, particularly sex trafficking, at hotels in general and at

6   the Hotel Defendants' hotels in particular.  Defendants and others in the industry have access to much

7   public information on the prevalence of human trafficking at hotels, including reports by, among

8   others, the Polaris project created for the use of the hospitality industry.  Indeed, attorneys for the

9   hospitality industry acknowledge that eight out of ten trafficking arrests occur in or around hotels.[5]

10        6.      The hospitality industry, speaking through the AHLA, OHLA, and other industry

11  organizations, has in recent years been increasingly vocal about its supposed "unified commitment"

12  to combat human trafficking.  Unfortunately, the near-total lack of concrete action by Defendants

13  and the rest of the hospitality industry shows that the industry in fact has a "unified commitment" to

14  continuing with business as usual, so that Defendants and all industry participants continue to profit

15  from human trafficking.

16  **JURISDICTION AND VENUE**

17        7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because

18  this action arises under the laws of the United States.

19        8.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff

20  resides within this District and a significant part of the acts and omissions giving rise to the cause of

21  action occurred in this District.

22        9.      The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking

23  Victims Protection Reauthorization Act ("TVPRA") and 18 U.S.C. § 2255, Child Abuse Victims'

24  Rights Act.

25  ///

26  ///

27  _____

[5] Keating, *Human Trafficking: What It Is And How It Impacts The Hospitality Industry*, Presentation
28  At AHIA Sprint Conference 2013, Washington, D.C.,
http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983 (last visited Mar. 1, 2019).

Levin Simes Abrams LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

## PARTIES

10.    Plaintiff J.M. is a natural person and a resident and citizen of California.

    a.  Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    b.  Due to the sensitive and intimate nature of the issues, Plaintiff J.M. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[6]

    c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[7] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[8] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[9]

    d.  Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and

---

[6] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[7] Fed. R. Civ. P. 10(a).

[8] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity)

[9] Fed. R. Civ. P. 26(c).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

community if her true identity was revealed in the public record.

 e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[10]

 f. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

11. **Defendant Red Roof Inns, Inc.** ("Red Roof Inn") is a large hotel brand with approximately 650 branded properties worldwide. It is an Ohio corporation with its principal place of business in New Albany, Ohio and can be served through its registered agent, Corporation Service Company, at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.

12. Red Roof Inn owns, supervises, and/or operates the Red Roof Inn® located at 1707 W Fremont St, Stockton, CA 95203.

 a. Red Roof Inn® hotels are Red Roof Inn brand hotels.[11]

 b. As a hotel operator, Defendant Red Roof Inn controls the training and policies for its hotels including the Red Roof Inn® hotel where J.M. was trafficked.

 c. Red Roof Inn receives a percentage of the gross room revenue from the money generated by the operations of all Red Roof Inn hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

///

///

---

[10] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

[11] Red Roof Inn, Inc. Privacy Policy available at https://www.redroof.com/privacy-policy.

13.    **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent, United States Corporation Company, at 50 West Broad Street, Suite 1330 Columbus, Ohio 43215.

14.    Choice owns, supervises, and/or operates the Rodeway Inn located at 339 S Wilson Way, Stockton, CA 95205.

a. Rodeway Inn® hotels are Choice brand hotels.

b. As a hotel operator, Defendant Choice controls the training and policies for its hotels, including the Rodeway Inn hotel where J.M. was trafficked.

c. Defendant Choice maintains that it considers guest safety and security to be important and requires the hotels in its portfolio to comply with Choice brand standards and all local, state, and federal laws.[12]

d. Choice receives a percentage of the gross room revenue from the money generated by the operations of all Rodeway Inn hotels, including a percentage of the revenue generated from the rate charged for the rooms in which the Plaintiff was sex trafficked.

15.    Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

///

///

///

///

---

[12] Choice Hotels, Human Rights Policy available at https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Mar. 25, 2021).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

## FACTUAL BACKGROUND

### INTRODUCTION

16.     This case brings claims against major hotel brand corporations for conspiracy, and violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA").

17.     The vast majority of commercial sex trafficking transactions occur within the hospitality industry.[13]

18.     The hospitality industry is controlled by a small number of powerful corporations ("Hotel Industry Leaders") with a handful of companies owning well over 90% of global hotel and motel properties. The chart below lists the largest Hotel Industry Leaders by number of properties.



Leading hotel companies worldwide as of June 2019, by number of properties

| Company | Number of properties |
| --- | --- |
| Wyndham Hotel Group | 9 157 |
| Choice Hotels International | 7 045 |
| Marriott International | 7 003 |
| Hilton Worldwide | 5 872 |
| InterContinental Hotels Group (IHG) | 5 656 |
| Best Western Hotels & Resorts | 4 008 |
| G6 Hospitality | 1 391 |
| Radisson Hotel Group | 1 179 |
| RLH Corporation | 1 167 |
| Hyatt Hotels Corp. | 865 |
| Aimbridge Hospitality | 834 |
| Westmont Hospitality Group | 692 |
| Red Roof | 637 |
| Extended Stay America | 627 |
| Interstate Hotels & Resorts | 479 |

Source
Hotel Management
© Statista 2019

Additional Information:
Worldwide; Hotel Management; June 2019

---

[13] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, Huffington Post (Jul. 22, 2015), https://www.huffpost.com/entry/combating-human- trafficking-in-the-hotel-industry_b_7840754 .

19.     Defendants are Hotel Industry Leaders who control the hospitality industry globally.

20.     The TVPRA prohibits Defendants from engaging in any venture they know or should know involves trafficking, and thereby establishes a non-delegable duty of reasonable care to detect and avoid participation in ventures they know or should know involves and perpetuates trafficking.

21.     Indeed, human trafficking in hotels is a top-down problem in the hospitality industry, and Hotel Industry Leaders like the Defendants are in the best position to, and have a duty and responsibility, to set policies and procedures to combat human trafficking and comply with the TVPRA.

22.     As the voice and image of the hotel industry, Defendants by association have a duty and responsibility to form a first line of defense against human trafficking in the hotel industry. Instead, Defendants collaborated and hired media professionals making public claims to investors and customers to "address" the longstanding problem of human trafficking at hotels rather than engaging experts in human trafficking and security to train hotel staff and implement mandatory and effective anti-human trafficking policies and protocols.

23.     Defendants, and thereby the entire hospitality industry, have utterly failed to take the actions needed to combat the known scourge of human trafficking within their brand hotels. Instead of taking reasonable steps to combat human trafficking in the hotel industry and thereby complying with their duties under state and federal law, Defendants conspired together to ensure they would save money related to compliance with the TVPRA and continue to profit millions of dollars from the trafficking occurring on their branded properties.

24.     Defendants conspired together to perpetuate a false narrative absolving Defendants from responsibility of the human trafficking taking place with their permission and control. As such, Defendants and the Hotel Industry Leaders individually and collectively advertised their condemnation of human trafficking, all the while jointly saving all costs associated with compliance with the TVPRA's non-delegable duty.

25.     As part of their conspiracy to save costs and continually reap millions of dollars in profits, Defendants and the Hotel Industry Leaders failed to develop mandatory and comprehensive

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

training to prevent human trafficking, failed to implement training to prevent human trafficking, and failed to conduct audits confirming that training had been implemented and that human trafficking occurrences were being prevented on their branded hotel properties. Defendants further failed to enact robust policies and practices to ensure continuous, directed action to combat human trafficking on their properties.

26.    Defendants are jointly and severally liable for Plaintiff's damages in this case.

27.    Plaintiff's injuries are indivisible.

28.    The TVPRA provides for joint and several liability.

**THE SEX TRAFFICKING OF PLAINTIFF J.M.**

29.    J.M. first met her traffickers in approximately 2006 when she was 25 years old.

30.    By means of a combination of violence, threats, and induced dependence on illegal substances, J.M. was held captive and sold for sex by her traffickers from approximately 2006 through 2012.

31.    During the time she was trafficked, J.M.'s traffickers frequently rented rooms at the Defendants' hotel locations because such rooms provided convenient, anonymous, and relatively central locations to which they could invite "johns" for the purpose of forcing J.M. to have sex with those "johns" for money.

32.    Throughout her trafficking, J.M.'s traffickers connected with "johns" willing to abuse J.M. for money by posting or causing to be posted entries on websites, including but not limited to Red Book and Escort Review advertising commercial sexual activity with J.M.

33.    These postings in online platforms known for human trafficking accomplished their goal to the point that J.M. was often sold and forced to perform sexual acts with multiple "johns" in a single night until she made her trafficker's quota.

34.    Over the course of a grueling six years while under the coercive control of traffickers and johns, J.M.'s traffickers rented rooms at, and forced her to have sex for money within, at least the following hotels:

a.    Red Roof Inn® at 1707 W Fremont Street, Stockton, CA 95203, staying on a rotating basis, weeks at a time, between approximately February 2012 and April

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

2012 ("Stockton Red Roof Inn®");

    b.  Rodeway Inn® by Choice Hotels International, Inc. at 339 S. Wilson Way, Stockton, CA 95205, living out of this location, between February 12, 2012 and April 23, 2012 ("Stockton Rodeway Inn®").

35.    During the time she was trafficked, J.M.'s traffickers constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly at intervals, including the Stockton Red Roof Inn® and Stockton Rodeway Inn®.

36.    While at Defendants' hotels, J.M.'s traffickers administered physical violence and withheld food and water to ensure that she could not escape.

37.    During her captivity at Defendants' hotels, including the Stockton Red Roof Inn® and Stockton Rodeway Inn®, J.M. was subjected to rape, frequent physical and verbal abuse, malnourishment, psychological torment, kidnapping, and false imprisonment permitted by Defendants' brand hotel employees and managers.

38.    At Defendants' Stockton Red Roof Inn® and Stockton Rodeway Inn®, J.M. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of J.M.'s deterioration brought on by the abuse perpetrated by her traffickers, including visible bruising and physical and verbal abuse occurring in public areas of Defendant's properties.

39.    Each "john" whom J.M. was sold to for the purpose of commercial sex at Defendants' properties, including the Stockton Red Roof Inn® and Stockton Rodeway Inn®, were nonpaying guest and would routinely leave within hours of arrival. The foot traffic to the rooms rented by J.M.'s traffickers occurred constantly and conspicuously.

40.    Traffickers of J.M. followed a repetitive and routine procedure during stays at the Defendants' hotels, which resulted in several consistent red flags, that were readily noticeable to employees, including:

    a.  Excessive requests for towels and linens;

    b.  Cash payments for rooms;

    c.  Paying for extended stays on a day-to-day basis;

    d.  Unusual numbers of used condoms in the garbage bins;

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

e.  Obvious signs of illegal drug use;

f.  Rooms requested away from other guests;

g.  Lots of male visitors coming in and out of rooms;

h.  Visible signs of prior physical abuse; and

i.  Yelling, fighting, and other altercations.

41.    Despite this abundance of available evidence of J.M.'s captivity and abuse, J.M. received no assistance from any employee of any Defendant, and Defendants continued to repeatedly rent rooms to her traffickers.

42.    The impact of being beaten, threatened, exploited, raped, sex trafficked, and ignored at Defendants' hotel properties has forever emotionally and physically injured J.M. who, despite the years since her escape, suffers immensely as a result of the horrors inflicted upon her at Defendants' hotels, including the Stockton Red Roof Inn® and Stockton Rodeway Inn®.

43.    Had Defendants not hewed to a common policy of harboring known and suspected human traffickers in exchange for their benefit, J.M.'s traffickers could not have successfully arranged the commercial sex transactions that were the reason underlying J.M.'s continued captivity.

44.    Had Defendants not hewed to a common policy of actively ignoring signs of ongoing human trafficking, the open and obvious signs of J.M.'s sex trafficking would likely have resulted in a far earlier reporting of her traffickers and thus in a far earlier end to her victimization.

45.    J.M.'s injuries are thus the direct and proximate result of the Hotel Defendants' maintenance of policies and procedures that they knew or should have known incentivized their employees to ignore the obvious signs of human trafficking, and even rent rooms to known or suspected human traffickers, while they continued to profit from sex trafficking.

46.    This action follows.

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS

47.    Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall

be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

48.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

49.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a large extent controlled by Defendants.

50.     Upon information and belief, per the relevant franchise agreements, Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

51.     Upon information and belief, Defendants' brand standards are so strict as to bar entirely certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

52.     It is further a standard practice in the hospitality industry, upon information and belief, followed by both Defendants, for parent companies to exercise significant control over the employment decisions of their brand hotels.

53.     Defendants and their brand hotels exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked. Upon information and belief, Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

///

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

54.     Under federal labor regulations, Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked. Specifically, Defendants create and promulgate policies relating to training employees to recognize and respond to human trafficking, and Defendants determine whether such training shall be mandatory.

55.     Despite their knowledge that few, if any, employees at their brand hotel locations actually receive training if the same are not mandated, Defendants have failed to mandate such training on any significant scale or at the specific locations where Plaintiff was trafficked. On information and belief, Defendants require their brand hotels to pay approximately 10% of gross revenue back to Defendants for the privilege of using Defendants' brand names and following their brand standards.

**DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING AT THEIR BRAND HOTELS**

56.     Defendants are, and have long been, on notice of repeated incidences of sex trafficking occurring at their brand hotels thanks, in part, to the copious publicly available evidence regarding the high prevalence of sex trafficking at hotels.

57.     For example, in 2004, End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

58.     Further, nationwide campaigns have repeatedly recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early as 1997 with the United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland Security's Blue Campaign. These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

59.     Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

60.     Defendants also have access to public police reports, news reports and internal reports generated by customer and employees, regarding sex trafficking at their own hotel locations in particular.

61.     Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

62.     Defendants have access to public outcries on platforms such as Twitter that garner support for initiatives, such as petitions on Change.org.

63.     A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their brand hotel locations:

**RED ROOF INN**

a. Regarding a June 2012 stay at the Red Roof Inn, a customer said: "WORST HOTEL I'VE EVER STAYED IN MY LIFE!!!!! My family took a road trip from southern California to Yosemite. We usually take one big vacation a year. We booked our hotel in advance, we had 3 rooms. Because of our road trip we didn't arrive until 10 pm that night when we arrived there were about 5 prostitutes outside with pimps. We were so frightened we drove around for 30 minutes trying to cancel our stay and because it was after 6 pm they wouldn't allow us to cancel. I'm positive the owner has some sort of deal with the drug

dealers and pimps there is no way he doesn't know this is going on. They don't even try to hide it!. After delegating with our families (it was 15 of us in a 15 passenger van) we were so exhausted we decided to sleep a couple of hours and leave at dawn. I was so afraid we would get our van stolen I parked it in front of the office and took my 1 year old daughters car seat in the room with me. I was so upset by this time I went complain at the front desk and of course the receptionist said the manager was not there and there was nothing she could do with out his approval. That she would try to give us a 20.00 discount, which of course we never saw. IF YOU VALUE YOUR LIFE STAY AWAY FROM THIS PLACE AT ALL COSTS!!!!!!!"

b.  Regarding a November 2012 stay at the Red Roof Inn, a customer said: "Horrible, was scared for our lives. My mother and I were moving from washington to california and after all day driving we finally found a hotel online, the red roof inn. When we got there it seemed okay right after we checked in two men came out and just kept watching us, and one starts following us. We decided to go to dinner but felt so uncomfortable we brought our electronics with. While we were gone we did more research and the day before someone had been murdered there. We came back and found two men around one of our vehicles and what looked like casing it. During the short time there we also saw drug dealing and prostitution in the parking lot. We went back to the room and looked around the sheets were dirty the bathroom was gross. So we decided we'd leave and because after 6pm we couldnt get a refund. We spent the night sleeping in our car at a rest stop where we felt safer at than that hotel. Do not stay here! Worst mistake!"

### CHOICE

c.  Regarding a 2014 stay at the Rodeway Inn by Choice at 339 S Wilson Way, Stockton, CA 95205, a customer said: "I went to this Rodeway Inn I would call it a HOTEL not Motel. I paid the manager my money to stay a whole week.. I went to check into my room and WILD LIFE CREATURES aka ROACHES

were everywhere when I turned the lights on!! I walked right back down stairs and while I was walking to the managers office I was asked by a female with a low cut skirt on if I would be interested in entertaing her room. I told her no that im just here to go get my money back.. she then walked over to her car with a aka GORILLA PIMP pointing at me.. I was very disturbed and didn't know what to do!! I went to the office and the manger was argueing with me about me getting back my money! DONT GO TO THIS HOTEL."

    d. The Rodeway Inn by Choice at 339 S Wilson Way, Stockton, CA 95205, is permanently closed and other hotels/motels in the area were also shut down due to "A MOTEL KNOWN FOR PROSTITUTION ACTIVITY" only a minute away from the Rodeway Inn.[14]

## DEFENDANTS' "UNIFIED COMMITMENT" TO HARBORING TRAFFICKERS

64.    Defendants and the Hotel Industry Leaders have long engaged in a coordinated campaign to divert negative attention and preserve the profits the hospitality industry derives from its regular provision of accommodation to human traffickers, thereby ensuring that each industry participant remains complacent and rents rooms to human traffickers with roughly the same frequency as its peers.

65.    Defendants have arrived at an understanding, whether explicit or tacit, that it is in the financial interest of the industry as a whole for all of its members to refrain from taking concrete, meaningful steps to identify human trafficking at their locations, and prevent the rental of rooms for the purpose of human trafficking. This is because:

    a. Defendants understand human trafficking is a significant revenue source for the industry as a whole, and a substantial decrease in the patronage of hotels by human traffickers would harm room rentals and revenue in the lodging industry;

    b. Defendants also understand that if any individual Defendant or other major chain

---

[14] The Record, *Wilson Way 'House of Prostitution' Shut* (Apr. 5, 2018), https://www.recordnet.com/story/news/crime/2018/04/05/wilson-way-house-prostitution-shut/985298007/

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

were to take concrete, meaningful steps to combat human trafficking, that entity would bear significant costs in lost revenue, combined with initial training and compliance costs, but would thereafter experience a significant competitive advantage and valuation for its brand and properties by investors, resulting from its increased reputation and decreased financial risk of liability;

c. Defendants understand that any such competitive advantage would be temporary because other industry participants would be compelled, in order to stay competitive and viable, to follow suit in taking such concrete, meaningful steps; and

d. Defendants understand that this would have the effect of closing human traffickers out of the hotel industry and significantly decreasing the prevalence of human trafficking generally, thereby decreasing the profits of all industry participants.

66.     Upon information and belief, Defendants are aware of public and private investors' criteria for valuing a company, including risks and liabilities for litigation, including compliance with the TVPRA.

67.     On information and belief, both Defendants are members of the American Hotel and Lodging Association ("AHLA"), which "is the largest national association solely representing all segments of the 8 million jobs the U.S. lodging industry supports, including hotel owners, REITs, chains, franchisees, management companies, independent properties, bed and breakfasts, state hotel associations, and industry suppliers… [and] proudly represents a dynamic hotel industry of more than 54,000 properties that supports $1.1 trillion in U.S. sales and generates nearly $170 billion in taxes to local, state and federal governments."

68.     Defendants are far from shy about the fact that the hotel industry acts in concert, through the auspices of the AHLA, with respect to its response to human trafficking. Indeed, they have recently taken to trumpeting this fact from the rooftops.

69.     For example, In September 2018, the AHLA issued a press release touting the recent public commitments of the CEOs of several major industry players, as well as, on information and belief, of senior representation of Defendants, to take certain limited steps to combat human

1    trafficking as "an unprecedented show of unity within a fiercely competitive industry."

2        70.    In June 2019, the AHLA issued a press release announcing its new "No Room for

3    Trafficking" initiative entitled "Hotel Industry Unites on New Campaign to Fight Human

4    Trafficking."

5        71.    In July 2019, the AHLA began running a commercial entitled "Unity," in which

6    the narrator states, "We're taking a unified industry approach to save lives."

7        72.    The AHLA webpage for that initiative currently advises industry participants that

8    "Another way that your hotel can raise awareness with guests is through social media posts that

9    highlight our industry's unified commitment to preventing human trafficking in hotels."

10        73.    Defendants and the Hotel Industry Leaders, acting through the AHLA, have thus

11    voiced a unified determination to ensure that all employees are trained to recognize human

12    trafficking and have access to the National Human Trafficking Hotline's telephone number.

13        74.    However, the behavior of Defendants demonstrates that this "unified

14    commitment" to a sharply limited training regimen represents an agreed-upon false standard for

15    their individual efforts to combat human trafficking, rather than implementing meaningful

16    change.

17        75.    The actual number of employees trained under the "No Room for Trafficking"

18    campaign and all prior industry initiatives relating to human trafficking is paltry. On information

19    and belief, less than half of current front desk employees at each Defendants' respective brand

20    hotel locations have been trained to recognize human trafficking.

21        76.    This is despite AHLA's then-Vice-President for Government Affairs stating in

22    2017 stating that while "[t]he cost of training varies . . . it's definitely not burdensome."

23        77.    Moreover, on reference and belief, nowhere in any of the trafficking- materials

24    promulgated through the auspices of the AHLA is any suggestion that Defendants will or should

25    take key actions that would doubtlessly reduce human trafficking, such as: (1) mandating—as

26    opposed to allowing for—their employees report suspected traffickers; or (2) forbidding their

27    employees to rent rooms to known or suspected human traffickers.

28        78.    On information and belief, neither Defendants, nor any other Hotel Industry

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

Leader, requires training regarding human trafficking for all employees likely to encounter human trafficking, nor did any do so during the time Plaintiff was trafficked.

79.    On information and belief, no Defendant has or had issued a policy requiring employees to report suspected instances of human trafficking when Plaintiff was trafficked.

80.    On information and belief, no Defendant has or had issued a policy forbidding employees from renting rooms to known or suspected human traffickers when Plaintiff was trafficked.

81.    On information and belief, no Defendant has taken any other significant action to combat human trafficking that was not directly called for by the industry as a whole through the auspices of the AHLA.

82.    In sum, the behavior of Defendants demonstrates façade programs and steps taken with at least a tacit "unified commitment" to limit government regulations and retain customer loyalty to brand hotels, while refraining from meaningful steps to end trafficking. Instead, standing behind the veil created by the Hotel Industry Leaders, Defendants chose to forgo mandatory policies that might have been more costly but would have had a meaningful effect on anti-human trafficking efforts at their brand hotels.

83.    On June 29, 2019, Defendants attended AHLA's strategic roundtable "bringing together industry leaders, government partners . . . to underscore the industry's efforts around human trafficking." On information and belief, senior leadership of each Defendant, who are on AHLA's board of directors, participated in this roundtable under the heading of "industry leaders."

84.    On information and belief, at or in the lead up to this roundtable, senior leadership for both Defendants discussed potential responses to human trafficking and specifically the possibility of going beyond recommending employee training for recognizing the signs of trafficking.

85.    On information and belief, during these discussions, senior leadership for both Defendants collectively rejected that possibility, thereby demonstrating their unwillingness to implement and enforce effective anti-trafficking measures, and reinforcing their preexisting

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

common understanding that recommending, let alone taking, further steps would be detrimental to the industry as a whole.

86.    On April 22, 2015, AHLA issued an earlier set of guidelines on human trafficking substantially like its "No Room for Trafficking" campaign.

87.    On information and belief, Defendants' senior leadership participated in discussions resembling those described above in participants, topics, and outcome that occurred in the lead-up to such issuance.

88.    The understanding among Defendants and the Hotel Industry Leaders would likely have collapsed in the event of the non-participation of a major industry player on the scale of any of the Defendants.

89.    In addition to acting together on a national level through the AHLA, the hotel industry, including Defendants, has acted together through its state organizations, in support of the same goals, namely touting a focus on certain limited training while preventing discussion of any mandatory action that might actually respond to, identify, and ultimately prevent human trafficking

## CAUSES OF ACTION

## COUNT I: 18 U.S.C. § 1595 ("TVPRA") (AGAINST BOTH DEFENDANTS)

90.    Plaintiff incorporates each foregoing allegation.

91.    Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

92.    Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

93.    Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and

1   demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they

2   received payment for rooms or received payments or kickbacks for internet usage, Defendants

3   directly benefitted from the sex trafficking of Plaintiff. The actions, omissions, and/or commissions

4   alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

5       94.     Plaintiff has suffered substantial physical and psychological injuries as the result of

6   being trafficked and sexually exploited at Defendants' hotels and properties.

7   **COUNT II: CONSPIRACY TO VIOLATE THE TVPRA (AGAINST BOTH DEFENDANTS)**

8       95.     Plaintiff incorporates each foregoing allegation.

9       96.     At all relevant times, Defendants knowingly agreed, contrived, confederated, acted

10  in concert, aided and abetted, and/or conspired to continue their longstanding practice of renting

11  rooms to known and suspected human traffickers, long after the enactment of § 1595 rendered it

12  illegal for them to profit from the same.

13      97.     For over a decade, upon information and belief, Defendants, individually, jointly,

14  and in conspiracy with each other as key leaders in the hotel and lodging industry and through

15  common understanding and design, implemented a malicious, sophisticated, and deceptive two-

16  pronged strategy to profit from ventures that they knew or should have known violated the TVPRA

17  as described above.

18      98.     First, Defendants promoted themselves and their industry as dedicated opponents

19  of human trafficking.

20      99.     Second, Defendants, pursuant to either an explicit agreement or at least an implicit

21  understanding, each maintained and continues to maintain policies, procedures, and training

22  protocols that create environments at their branded hotel locations in which it is understood and

23  accepted that rooms shall be rented to known and suspected human traffickers and profit shall be

24  derived therefrom.

25      100.    Defendants control nearly every aspect of operations, including employee

26  management, at their branded hotel locations through a web of franchise agreements and brand

27  quality standards.

28      101.    The staffing decisions at the individual hotel locations are sufficiently controlled by

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

Defendants as to render staff at those locations' agents and joint employees of the brand manager Defendants and the individual hotel locations. *See* M.A. v. Wyndham Hotels & Resorts, Inc., 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

102.     The staff at individual locations, including the locations at which Plaintiff was trafficked, took affirmative action, as agents of the brand manager Defendants, to provide lodging to individuals who the staff and the brand manager Defendants knew or should have known were engaged in human trafficking.

103.     The staff took these actions in compliance with a set of policies, procedures, and training protocols created, and subsequently maintained with few changes, by Defendants in the full knowledge that—and, upon information and belief, with the intent that—such policies, procedures, and training protocols would ensure that human traffickers continued to do business at Defendants' branded hotel locations thus generating profit for Defendants.

104.     Moreover, upon information and belief, despite the overwhelming data possessed by, and available to, Defendants, Defendants individually, jointly and in conspiracy with each other willfully and maliciously used their influence, through the AHLA, over local, state and federal agencies to restrict the disclosure of and otherwise to mask material facts about the prevalence of human trafficking and the hotel industry's failure to act regarding the same.

105.     As co-conspirators, Defendants are jointly and severally liable for Plaintiff's trafficking at every property. Defendants' conspiracy to maintain practices, policies and procedures that allowed Defendants' to financially benefit from unlawful commercial sex ventures and human trafficking.

106.     Defendants' conspiracy kept Defendants, who knew or should have known about human trafficking at their California properties from taking meaningful action, resulting in significant injuries to Plaintiff and additional victims.

107.     Defendants' conspiracy is a continuing conspiracy, and the overt acts performed in furtherance of the conspiracy's objective(s) are ongoing.

///

///

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate

## JURY DEMAND

Plaintiff hereby demands a trial by struck jury.

Dated: April 15, 2022                          **LEVIN SIMES ABRAMS LLP**

/s/ Rachel Abrams
Rachel Abrams, Esq. (SBN 209316)
Amanda J.G. Walbrun, Esq. (SBN 317408)
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: rabrams@levinsimes.com
Email: awalbrun@levinsimes.com

/ / /

/ / /

/ / /

/ / /

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**BABIN LAW, LLC**

/s/Steven C. Babin, Jr.
Steven C. Babin, Jr., Esq. (*pro hac vice forthcoming*)
(Ohio SBN 0093584)
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
Telephone: 614-761-8800
Email: steven.babin@babinlaws.com

*Attorneys for Plaintiff J.M.*

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax