**LEVIN SIMES ABRAMS LLP**
Rachel Abrams (SBN 209316)
Brian J. Perkins (SBN 315870)
Amanda J.G. Walbrun, Esq. (SBN 317408)
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: rabrams@levinsimes.com
Email: bperkins@levinsimes.com
Email: awalbrun@levinsimes.com

**BABIN LAW, LLC**
Steven C. Babin, Jr., Esq. (*pro hac vice forthcoming*)
(Ohio SBN 0093584)
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
Telephone: 614-761-8800
Facsimile: (614) 706-1775
Email: steven.babin@babinlaws.com

*Attorneys for Plaintiff J.M.*

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.M., an individual,<br><br>        Plaintiff<br><br>   v.<br><br>CHOICE HOTELS INTERNATIONAL, INC.;<br>AND RED ROOF INNS, INC.<br><br>        Defendants. | Case No. 2:22-cv-00672-KJM-JDP<br><br>**FIRST AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

L EVIN S IMES A BRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff J.M., by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments against CHOICE HOTELS INTERNATIONAL, INC. and RED ROOF INNS, INC.[1]  Plaintiff's allegations are based upon information, belief, and investigation, except as to facts which are personally known.

## INTRODUCTION

1.    For decades, sex traffickers have brazenly operated in and out of hotels throughout this country. Criminals have paraded their misconduct openly on hotel properties while the hotels and hospitality giants pay only lip service to campaigns against sex trafficking, standing by to collect profits from sex trafficking at the expense of human life, human rights, and human dignity.

2.    Traffickers rely on Defendants' permissive conduct and failure to enact and enforce anti-trafficking measures, despite Defendants' vast knowledge of this criminality within their walls.

3.    Defendants Choice Hotels International, Inc. ("Choice") and Red Roof Inns, Inc. ("Red Roof") (collectively, "Defendant Brands" or "The Brands"), knew and have known for decades that sex trafficking repeatedly occurs under their brand flags.

4.    Rather than taking timely and effective measures to thwart this epidemic, Defendants choose to ignore the open and obvious presence of sex trafficking on their branded properties, benefitting from the profit and fees created by rooms rented for this explicit and apparent purpose.

5.    Plaintiff J.M. is just one of the estimated 40 million victims of human trafficking worldwide.[2]  The sex trafficking industry alone pulls in an estimated $99 billion each year, making it the second largest illicit trade after the sale of all illegal drugs.[3]  However, traffickers are not the only profiteers.  The hotel industry, including Defendants, makes millions from sexual slavery as

---

[1] Plaintiff files this amended complaint as a matter of course pursuant to Rule 15(a)(1)(B) of the Federal Rules of Civil Procedure permitting amendment within twenty-one days after service of a motion to dismiss.  Plaintiff filed her original pleading on April 15, 2022 (ECF No. 1).  On May 27, 2022, Defendant Choice Hotels International, Inc. filed a Rule 12(b)(6) motion to dismiss Plaintiff's complaint.  (ECF No. 8).  Plaintiff thus properly amends her complaint by the June 17, 2022, deadline of Rule 15(a)(1)(B) and in accordance with Local Rules 200, 220, and 230.
[2] INT'L LAB. ORG., PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOR 13 (2014).
[3] Id.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1 traffickers and buyer "johns" rent rooms where victims are sold and sexually exploited night after

2 night, while Defendant Brands, property management, and staff look the other way.  This mutually

3 beneficial relationship fuels the epidemic, allowing traffickers and the hospitality industry to reap

4 the benefits at the expense of victims' lives.

5     6.    J.M. now brings this action for damages against Defendants pursuant to the federal civil

6 remedy under 18 U.S.C. § 1595.  Each Defendant, knowingly benefitted from participation in a

7 commercial business venture that it knew or should have known to be engaging in sex trafficking

8 acts in violation of 18 U.S.C. § 1591(a).

9     7.    Defendants' decision to prioritize profits over protecting sex trafficking victims results in

10 the repeated exploited of countless victims like J.M. on their brand properties.  J.M.'s traffickers

11 forced her onto Defendants' properties where she was repeatedly raped and forced to perform

12 commercial sex acts under threats of physical and psychological abuse.  Defendant Brands'

13 management and employees witnessed the signs of J.M.'s exploitation but failed to take any action

14 to prevent, report, or stop it from happening at neither the time nor in the future.

15     8.    The American Hotel Industry's apathy towards human trafficking has allowed human

16 trafficking in the United States to flourish.  Defendants and other members of the hospitality industry

17 have long been aware of the prevalence of human trafficking, particularly sex trafficking, at hotels

18 worldwide and at their own properties.   Defendants and others in the industry have access to much

19 public information on the prevalence of human trafficking at hotels, including reports by, among

20 others, the Polaris project created for the use of the hospitality industry.

21     9.    The hospitality industry, speaking through industry organizations, has in recent years been

22 increasingly vocal about its supposed "unified commitment" to combat human trafficking.

23 Unfortunately, the near-total lack of concrete action by Defendants and the rest of the hospitality

24 industry shows that the industry in fact has a "unified commitment" to quite the opposite: a continuation

25 of business as usual, so that Defendants and all industry participants continue to profit from hotel

26 human trafficking.

27 ///

28 ///

                                FIRST AMENDED COMPLAINT

10.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

12.    The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595 and the Child Abuse Victims' Rights Act 18 U.S.C. § 2255.

**PARTIES**

13.    **Plaintiff J.M.** is a natural person and a resident and citizen of California.

    a.  Plaintiff is a "victim" survivor of trafficking pursuant to 22 U.S.C. § 7102(17) and 18 U.S.C. §§ 1591(a) and 1595(a) and a survivor of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

    b.  Due to the sensitive and intimate nature of the issues, Plaintiff J.M. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[4]

    c.  Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[5] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[6] For good cause, the Court may issue an order

---

[4] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[5] Fed. R. Civ. P. 10(a).

[6] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See e.g.,*

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

L E V I N S I M E S A B R A M S L L P
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense.[7]

d. Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears the stigma from her family, friends, employer, and community if her true identity was revealed in the public record.

e. Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[8]

f. Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her personal life or future employment prospects.

14. **Defendant Choice Hotels International, Inc. ("Choice")** is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees. It is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent, United States Corporation Company, at 50 West Broad Street, Suite 1330, Columbus, Ohio 43215.

15. Choice owns, supervises, manages, controls, and/or operates the Rodeway Inn® located

---

*M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity)

[7] Fed. R. Civ. P. 26(c).

[8] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

at 339 S Wilson Way, Stockton, CA 95205 ("Stockton Rodeway Inn®") where J.M. was trafficked.

    a.  Choice owns and controls the Rodeway Inn® brand, and the Stockton Rodeway Inn® is a Choice branded property.[9]

    b.  Choice is the principal in an agency relationship with the Stockton Rodeway Inn®. It is both directly and vicariously liable for the acts and/or omissions of the staff at its brand hotels, including the Stockton Rodeway Inn® where J.M. was trafficked. The Stockton Rodeway Inn® also has apparent agency for Choice so as to establish vicarious liability, in addition to an actual agency relationship.

    c.  Choice ratified the actions and inactions of the Stockton Rodeway Inn®.

    d.  Choice exercises day-to-day control over the Stockton Rodeway Inn® and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Stockton Rodeway Inn®, as either direct subsidiaries or under the terms of its franchise agreements.

    e.  Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Stockton Rodeway Inn®. Choice also advertises its brand hotels through national press releases, newsletters, emails, announcements on its national website, and mentions across its corporate media channels.[10]

    f.  Through its national sales team, Choice controls the credit processing system and centralized direct billing at its brand hotels, including the Stockton Rodeway Inn®.[11]

    g.  As the principal and as a hotel operator, Choice controls the training, polices, and procedures for its brand hotels, including the Stockton Rodeway Inn®. Choice

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

---

[9] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 2022).

[10] *Why Choice?*, CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022).

[11] *Id.*

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Choice.[12]

h. Choice claims to "strive to conduct [its] business operations free from violations of human rights" and offers—but does not require—training for its brand hotels.[13]

i. Choice controls and provides centralized technology systems for hotel operations at its brand hotels, including systems its brand hotels must use to access shared customer data and reservations information. Choice also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Stockton Rodeway Inn®.[14]

j. In addition, through an integrated corporate marketplace, Choice mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Stockton Rodeway Inn®.

k. Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are

---

[12] *See e.g.*, *id.* ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").

[13] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

[14] *Why Choice?*, CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022).

7

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

shortened by such onerous and exorbitant requirements.[15]

l.   Choice knowingly benefited, or received something of value, from its commercial business venture at the Stockton Rodeway Inn® through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.M. was trafficked, as well as in maintaining a positive public image for the Rodeway Inn® brand.

m.   Choice is subject to the jurisdiction of this Court because it regularly conducts business in California, including through the operation of numerous hotels in California such as the Stockton Rodeway Inn®, contracting to supply services in California, and deriving substantial revenue from services rendered in California, has caused indivisible injuries to J.M. in California, and profited from a commercial business venture which unlawfully permitted criminals to sell J.M. for commercial sex at the Stockton Rodeway Inn® in California.

16.   **Defendant Red Roof Inns, Inc.** ("Red Roof") is a global hotel brand with approximately 650 branded properties worldwide. It is an Ohio corporation with its principal place of business in New Albany, Ohio and can be served through its registered agent, Corporation Service Company, at 50 W. Broad Street, Suite 1330, Columbus, OH 43215.

17.   Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn® located at 1707 W Fremont St, Stockton, CA 95203 ("Stockton Red Roof Inn®").

a.   Red Roof owns and controls the Red Roof Inn® brand, and the Stockton Red Roof Inn® is a Red Roof brand property.[16]

b.   Red Roof is the principal in an agency relationship with the Stockton Red Roof Inn® Stockton.[17] It is both directly and vicariously liable for the acts and/or omissions

---

[15] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/convert-a-hotel/#upscale (last visited Jun. 9, 2022).

[16] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

[17] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue-management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

of the staff at its brand hotels, including the Stockton Red Roof Inn® where J.M. was trafficked. The Stockton Red Roof Inn® also has apparent agency for Red Roof so as to establish vicarious liability, in addition to an actual agency relationship.

c. Red Roof ratified the actions and inactions of the Stockton Red Roof Inn®.

d. Red Roof exercises day-to-day control over the Stockton Red Roof Inn® and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Stockton Red Roof Inn®, as either direct subsidiaries or under the terms of its franchise agreements.

e. Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Stockton Red Roof Inn®.[18] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[19]

f. Through its national sales team, Red Roof controls the credit processing system and centralized direct billing at its brand hotels, including the Stockton Red Roof Inn®.[20]

g. As the principal and as a hotel operator, Red Roof controls the training, polices, and procedures for its brand hotels, including the Stockton Red Roof Inn®. Red Roof

---

[18] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022); *Distribution*, RED ROOF, https://www.redrooffranchising.com/distribution (last visited Jun. 9, 2022) ("[Red Roof's] dedicated Red Roof reservations and customer service center…provides location-specific, dynamic availability, with automatic rate updates to all distribution systems including GDS, OTAs, and third party sites. [Red Roof] also offer a RediRewards® members-only line, to reward [its] most loyal customers.")

[19] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[20] *Sales Team*, RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

Levin Simes Abrams LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[21]

h. Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[22] Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Stockton Red Roof Inn®.

i. In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Stockton Red Roof Inn®.[23]

j. Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction

---

[21] *See e.g.*, *Brand Support*, Red Roof, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training. On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[22] *Technology*, Red Roof, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, Red Roof, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[23] *See Operational Support Procurement Services*, Red Roof, https://www.redrooffranchising.com/operational-support (last visited Jun. 6, 2022).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[24]

k.   Red Roof knowingly benefited, or received something of value, from its commercial business venture at the Stockton Red Roof Inn® through royalty payments, licensing fees, and percentages of the gross room revenue generated by the hotel operations, including rates charged through rooms where J.M. was trafficked, as well as in maintaining a positive public image for the Red Roof Inn® brand.

l.   Red Roof is subject to the jurisdiction of this Court because it regularly conducts business in California, including through the operation of numerous hotels in California such as the Stockton Red Roof Inn®, contracting to supply services in California, and deriving substantial revenue from services rendered in California, has caused indivisible injuries to J.M. in California, and profited from a commercial business venture which unlawfully permitted criminals to sell J.M. for commercial sex at the Stockton Red Roof Inn® in California.

18.   Whenever reference is made in this Complaint to any act, deed or conduct of the Defendants, the allegation is that the Defendants engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of the Defendants.

## **FACTUAL ALLEGATIONS**

## **A.   HUMAN TRAFFICKING IS A $150 BILLION DOLLAR BUSINESS INEXTRICABLY LINKED TO DEFENDANT BRANDS & THE HOSPITALITY INDUSTRY**

19.   Defendants are complicit in the world's fastest growing crime.[25]  The International Labor

---

[24] *See Design and Construction*, RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).

[25] *Human Trafficking is the World's Fastest Growing Crime*, THE ADVISORY BOARD (May 22, 2017, 9:30 AM), https://www.advisory.com/daily-briefing/2017/05/22/human-trafficking.

Levin Simes Abrams LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

Organization (ILO) estimates there are roughly 40 million victims of human trafficking globally, with hundreds of thousands in the United States.[26] Put into perspective, this means there are 5.4 victims of human trafficking for every 1,000 people in the world.[27] Additionally, one in four human trafficking survivors are children.[28]

20. The worldwide estimated total of illegal profits obtained from the use of forced labor human trafficking is $150.2 billion per year.[29]

21. Two-thirds of these profits are generated by forced sexual exploitation. The sex trafficking industry alone is therefore the second largest illicit crime industry behind only the sale of *all* illegal drugs.[30]

22. Indeed, sex trafficking victims comprise only 22% of the world's total forced labor but are "six times more profitable than all other forms of forced labor, and five times more profitable than forced labor exploitation outside domestic work."[31]

23. Statistics released in 2014 showed approximately 4.5 million people were victims of forced sexual exploitation globally and each trafficker earned approximately $22,000 per victim.[32] In developed nations like the United States, the average annual profit per sex trafficking victim is $80,000.[33]

24. Sex traffickers, or "pimps," use threats, violence, manipulation, lies, debt bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will. Coercion can take on many different forms ranging from extreme physical violence to withholding food and necessities to emotional abuse. And while the media and police often report

---

[26] Int'l Lab. Org. & Walk Free Foundation, Global Estimates of Modern Slavery (2017).

[27] *Id.*

[28] *Id.*

[29] Int'l Lab. Org., Profits and Poverty: The Economics of Forced Labor 13 (2014).

[30] *Id.*

[31] *Id.* at 7, 15.

[32] *Id.* at 13, 15.

[33] *Id.* at 27.

LEVIN SIMES ABRAMS LLP

1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

sex trafficking as "prostitution," in reality, up to 90% of commercial sex activity is coerced sexual exploitation and slavery.[34]

25.    Yet, criminal sex traffickers could not succeed in this hugely profitable industry alone. Experts agree that human trafficking is increasingly less underground, and traffickers routinely interact and utilize commercial businesses for their criminal endeavors. "[T]raffickers use banks to deposit and launder their earnings; they use planes, buses and taxi services to transport their victims; they book hotel rooms integral also to sex trafficking; and, they are active users of social media platforms to recruit and advertise the services of their victims."[35]  The private sector's involvement in the sex trafficking trade is undeniable, and companies have a responsibility to address their role in it with active and effective measures.[36]

26.    In particular, the hospitality industry and Defendant Brands' hotels are at the center of the sex trafficking trade. Countless research, news, and nonprofits have confirmed the "obvious nexus" between human trafficking and hotels' crucial role as the venue for selling commercial sex.[37]

27.    An overwhelming majority of commercial sex trafficking transactions occur within the

---

[34]  *See* Trafficking in Persons (TIP) Report, U.S. DEP'T OF STATE 372 (2011), http://www.state.gov/documents/organization/164458.pdf; Mark Grough & Toby Goldbach, *Relationship between Pimps and Prostitutes*, CORNELL UNIVERSITY LAW SCHOOL, https://courses2.cit.cornell.edu/sociallaw/student_projects/PimpsandProstitutes.htm#:~:text=Pimp%2Dcontrolled%20prostitution%20is%20ubiquitous,over%20time%2C%20and%20a%20US.

[35]  Carmen Niethammer, *Cracking The $150 Billion Business Of Human Trafficking*, FORBES (Feb. 2, 2020), https://www.forbes.com/sites/carmenniethammer/2020/02/02/cracking-the-150-billion-business-of-human-trafficking/.

[36]  *Id*. (quoting Bradley Myles, chief executive officer of Polaris: "Human trafficking is a $150 billion a year global industry and can't be fully addressed without businesses taking active and effective measures to reduce the potential for exploitation within their own systems.").

[37]  Brittany Anthony, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking,* Hotels and Motels, POLARIS 16-23 (Jul. 2018) https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf; *see also Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-recommendations; Giovanna L. C. Cavagnaro*, Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

hospitality industry as traffickers use hotels as the hub of their operations.[38]  Inside, the victims are harbored, raped, assaulted, and forced to service buyers who come to the hotel solely to purchase sex.

28.    The trope of the "no-tell motel" is certainly not a new one.  However, the problem is industry wide and not confined to only low budget public lodging.  In the United States, as much as 63% of all trafficking incidents happen in hotels ranging from luxury to economy.[39]

29.    Statistics confirm how deeply entwined the hospitality industry is with human trafficking.  Hotels are the top-reported venue where sex trafficking acts occur, even over commercial front brothels.[40]

30.    A recent survey of survivors who called the National Human Trafficking Hotline found 60% had been forced to engage in commercial sex within the confines of a hotel or motel during their trafficking, and 75% had stayed in a hotel or motel during travel or otherwise directly encountered a hotel or motel at some point during their trafficking. [41]  Indeed, even attorneys for the hospitality industry acknowledge that eight out of ten trafficking arrests occur in or around hotels.[42]

31.    It is no accident that hotels are the top choice of venue for traffickers over commercial front brothels. [43]  Hotels have long profited from their reputations as havens of privacy and

---

[38] Bradley Myles, *Combating Human Trafficking in the Hotel Industry*, HUFFINGTON POST (Jul. 22, 2015),     https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754 .

[39] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hospitality Industry*, CORNELL HOSPITALITY REPORT, 15(15), 3-10 (2015).

[40] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

[41] *On-Ramps, Intersections, and  Exit  Routes,* POLARIS (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking- Hotels-and-Motels.pdf.

[42] Rich Keating, *Human Trafficking: What It Is and How It Impacts The Hospitality Industry,* Presentation.  Delivered At AHIA Sprint Conference 2013, Washington, D.C., available at http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983.

[43] *National Human Trafficking Hotline Statistics*, THE POLARIS PROJECT (2016), https://polarisproject.org/resources/2016-hotline statistics.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

discretion for the offending.  Hotels offer anonymity and non-traceability, making them ideal venues for crime and, in particular, sex trafficking.  In addition, "buyers" purchasing people for sex, typically choose to engage in trafficking away from their home, naturally leading to the increased involvement of hotels.

32.   "Contrary to popular misconception, trafficking does not only take place in cheap hotels or motels with sub-par accommodations."[44]  Rather, traffickers select hotel businesses based on a variety of factors, including "convenient locations, buyer comfort, price, a hotel's policies, procedures,…infrastructure," and "whether the hotel is prone to law enforcement monitoring…[or is] "perceived by traffickers to have distracted and busy staff."[45]

33.   Due to the overall complacency of Defendants and similar brands on addressing this issue, their brand hotels are often *the* venue of choice for sex trafficking.  Traffickers and buyers both rely and capitalize on The Brands' general refusal to adopt and enforce company-wide anti-trafficking policies, train staff on what to look for and how to respond, and/or establish safe and secure reporting mechanisms for those at the point of sale.  The Brands and their hotels thus provide an ease of access for buyers, an ability to pay in cash (non-traceability), and the ability to maintain anonymity, privacy, discretion, and permission which increases the prevalence of sex trafficking at their branded hotels.[46]

34.   The Brands have both the power and responsibility to make sex trafficking difficult for criminals. Yet, they repeatedly fail to heed the call, execute anti-trafficking measures, or enforce their own policies.  Instead, each continues to facilitate these crimes at their branded hotels, content to direct their efforts solely to profit and the bottom line.

35.   While 75% of trafficking survivors report coming into contact with a hotel at some point during their exploitation, 94% percent disclosed they never received any assistance, concern, or

---

[44] Anthony, *supra* note 37 at 18.

[45] *Id*.

[46] *Id*.

LEVIN SIMES ABRAMS LLP

1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1    identification from hotel staff.[47]

2    36.    Every day, thousands of brand hotel employees are firsthand witnesses to the red flag

3    signs of human trafficking, and are well positioned to intervene and prevent future exploitation

4    within the brand hotel.

5    37.    Put simply, hotels are a "crucial piece of the infrastructure necessary to facilitate human

6    trafficking" because "hotel chain franchises…offer a good balance of quality and price while

7    giving buyers a sense of anonymity and safety."[48]

8    38.    Due to the Brands' individual and collective failure to embrace anti-trafficking policies,

9    practices, and training, children and other vulnerable persons are trafficked for sex in hotels

10   throughout the United States and worldwide.

11   39.    Defendant Brands have not only a morale, but a legal, responsibility to those who enter

12   their properties and are accountable for playing a primary role in encouraging and permitting sexual

13   servitude to endure into modern day.

14   **B.    DEFENDANTS' KNOWLEDGE OF THEIR ROLE IN THE  SEX TRAFFICKING**

15   **TRADE & REFUSAL TO IMPLEMENT AVAILABLE RESOURCES TO COMBAT IT**

16   **1.    <u>National and International Efforts to Combat Sex Trafficking are Ineffective without</u>**

17   **<u>Earnest Involvement by the Brands.</u>**

18

19   40.    Defendants are aware that the hospitality industry is a major life source of the human

20   trafficking epidemic both in the U.S. and abroad.[49] The United Nations,[50] international non-

21   ─────────────────────

22   [47]    *Hotels & Motels Recommendations*, POLARIS https://polarisproject.org/hotels-motels-

23   recommendations.

     [48] *Id.*

24   [49] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*,

25   CORNELL    UNIVERSITY    SCHOOL    OF    HOTEL    ADMINISTRATION    (2017),
     http://scholarship.sha.cornell.edu/honorstheses/3.

26   [50] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020),

27   848 https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf;
     *see also We must act together to fight exploitation and human trafficking in tourism, say United*

28   *Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (Apr. 24, 2012),

NO. 2:22-CV-00672-KJM-JDP                                    FIRST AMENDED COMPLAINT

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1  profits,[51] and the U.S. Department of Homeland Security,[52] have all documented this well-known

2  epidemic of human trafficking for years, and brought particular attention to the indispensable role

3  of hotels.  Defendants have known for decades about the public outcry against human trafficking

4  in hotels and the particular uproar surrounding the involvement of their industry.

5  41.  Nationwide campaigns recognized the issue of human trafficking in the hotel industry

6  and the lack of internal policies to address the issue, and took initiative as early as 1997 with the

7  United Nations Blue Heart Campaign and domestically in 2010 with the Department of Homeland

8  Security's Blue Campaign.[53]  These efforts sought to educate both the public and private sectors

9  on identifying and combatting human trafficking, including the hospitality industry and both

10  campaigns released online resources and toolkits publicly accessible to any entity concerned with

11  human trafficking.[54]

12  42.  The General Assembly of the United Nations convening in New York, New York in

13  November 2000 adopted the Palermo Protocol to prevent, suppress, and punish trafficking in

14  persons.[55]  In this regard, End Child Prostitution and Trafficking ("ECPAT-USA") launched the

15  Tourism Child-Protection Code of Conduct (the "Code") in the United States in 2004.[56]

16

17  https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-
    exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html.

18
    [51] The Polaris Project and ECPAT-International have published extensive reports and professional
19  toolkits on human trafficking in the hospitality industry for years.

20  [52] Human Trafficking and the Hospitality Industry, U.S. DEP'T OF HOMELAND SECURITY (2020),
    https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF
21  HOMELAND SECURITY (2016), https://www.dhs.gov/sites/default/files/
    publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
22
    [53] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
23  https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

24  [54] *Human Trafficking and the Hospitality Industry*, DEP'T OF HOMELAND SECURITY,
    https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Jun. 19, 2019).
25
    [55] Protocol to Prevent, Suppress and Punish Trafficking in Persons, Especially Women and
26  Children, supplementing the United Nations Convention against Transnational Organized Crime,
    *adopted* Nov. 15, 2000, 2237 U.N.T.S. 319.
27
    [56]  ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017),
28  https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b
    8c/1506391761747/NoVacany_Report.pdf.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

43.     The U.S. Department of State launched the Blue Campaign in 2010, as a national public awareness campaign designed to educate the public, law enforcement, and other industry partners to recognize the indicators of human trafficking.[57] Since then, the U.S government has released its Trafficking in Persons Report each year, which gathers statistics on the prevalence of trafficking, including the hospitality industry.[58] In addition, the President's Interagency Task force to Monitor and Combat Trafficking in Persons (PITF) coordinated between twenty federal agencies to implement the U.S. National Action Plan to Combat Trafficking.[59]

44.     During a speech in New York City in September 2012, President Obama stated that human trafficking "ought to concern every person, because it is a debasement of our common humanity. It ought to concern every community because it tears at our social fabric. It ought to concern every business because it distorts markets. It ought to concern every nation, because it endangers public health and fuels violence and organized crime."[60]

45.     In December 2015, President Obama appointed eleven (11) survivors of human trafficking to the inaugural United States Advisory Council on Human Trafficking to advise and make recommendations on federal anti-trafficking policies to the President's Interagency Task Force to Monitor and Combat Trafficking in Persons.[61]

46.     The United States Department of Justice ("DOJ") brought 248 sex trafficking prosecutions in Fiscal Year 2015 and secured convictions against 291 sex traffickers.[62]   In the

---

[57] *About the Blue Campaign,* DEP'T OF HOMELAND SECURITY, https://www.dhs.gov/blue-campaign/about-blue-campaign.

[58] *See 2021 Trafficking in Persons Report* (2021), https://www.state.gov/reports/2021-trafficking-in-persons-report/.

[59] *See* Ned Price, *Release of the National Action Plan to Combat Human Trafficking,* US DEP'T OF STATE (2021), https://www.state.gov/release-of-the-national-action-plan-to-combat-human-trafficking/.

[60] President Barack Obama, Remarks to the Clinton Global Initiative (Sept. 25, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/09/25/remarks-president-clinton-global-initiative.

[61] U.S. DEP'T OF STATE, 2016 TRAFFICKING IN PERSONS REPORT 41 (2016), https://www.state.gov/documents/organization/258876.pdf.

[62] *Id*. at 389.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1    previous year, DOJ convicted a total of 184 human traffickers (inclusive of labor trafficking) and

2    in the subsequent year, DOJ convicted a total of 439 human traffickers (inclusive of labor

3    trafficking).[63]

4    47.    Despite these efforts of governmental and non-governmental organizations to combat

5    human trafficking, the hospitality industry as a whole, continued to lag behind in its efforts to

6    prevent human trafficking. Fifteen years after the adoption of the Palermo Protocol, one study

7    found 45% of children who suffered sexual exploitation reported that their sexual exploitation took

8    place in a hotel.[64]

9    48.    The complicity of the hospitality industry is essential to the perpetuation of human

10   trafficking, allowing traffickers to remain transient, collect profits, and evade detection. Sex

11   trafficking ventures move from place to place so that they are less visible to law enforcement.

12   Similarly, sex traffickers also want to keep their victims moving from place to place to isolate them

13   from any possible means of escape or rescue. Traffickers are well aware of the seclusion and

14   anonymity attendant with booking rooms with hotel chains – they know it is unlikely that they will

15   be disturbed.

16   49.    Recognizing action by the hospitality industry is thus the key to both combatting—or

17   continuing—human sex trafficking, Representative Ann Wagner made the following statement:

18   "Partnership between public and private sectors is the key to combating human trafficking. Many

19   times, frontline employees in the transportation and hospitality industry are the ones best suited to

20   identify trafficking victims or their predators. Increased awareness and training will lead to more

21   victims being identified, which is the critical step in breaking the cycle of exploitation and

22   victimization."[65]

23   ///

24   ///

25

26   [63] Human Rights First, *Fact Sheet 2017* (2017), http://www.humanrightsfirst.org/sites/default/files/

27   TraffickingbytheNumbers.pdf.

     [64] Sarkisian, *supra* note 23.

28   [65] 161 Cong. Rec. H3266-01, H3280

### 2. **Defendant Brands Ignore Red Flag Resources and Refuse to Implement Sex Trafficking Staff Training.**

50.   Defendants have long been on notice of repeated incidences of sex trafficking occurring at their brand hotel locations thanks, in part, to the copious publicly available evidence regarding the high prevalence of sex trafficking at hotels. The United Nations, the US Government, and international nonprofits like ECPAT-USA and the Polaris Project, have documented the warning signs of human trafficking, as well as recommended policies, procedures, and training to prevent exploitation within the hospitality industry.

51.   The key indicators of sex trafficking at hotels have been known for years despite Defendants' failure to implement anti-trafficking measures.

52.   To assist Defendants in combatting sex trafficking within their companies, in 1996, ECPAT developed and launched The Code of Conduct for the Protection of Children from Sexual Exploitation in Travel and Tourism ("The Code") and ECPAT-USA in the United States in 2004.[66]

53.   The Code identifies the following steps companies should take to prevent child sex trafficking: (1) establish corporate policy and procedures against sexual exploitation of children; (2) train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases; (3) include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children; (4) provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases; (5) support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and (6) report annually on the company's implementation of Code-related activities.[67]

54.   ECPAT-USA further identified hotel-specific best practices for preventing sex trafficking, including but not limited to:

   a.   Develop a formal policy against trafficking;

---

[66] *What is the Code?*, THE CODE.ORG, https://thecode.org/about/ (last visited Apr. 1, 2022); *see also* ECPAT-USA, *No Vacancy For Child Sex Traffickers Impact Report* (2017), https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/59c9b6bfb07869cc5d792b8c/1506391761747/NoVacany_Report.pdf.

[67] *Id.*

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

b.  Develop a protocol for response;

c.  Conduct periodic training on indicators;

d.  Do not rent by the hour;

e.  Do not permit cash payments;

f.  Block "internet access to popular websites for online sex ads";

g.  Monitor "online sex ads such as Craigslist and Backpage for your hotel name and pictures of your rooms and guests";

h.  Change wi-fi passwords in rooms and cafes regularly;

i.  Require all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number;

j.  Actively greet and speak with all visitors arriving at night;

k.  Watch for a trend of visitors to the same room; and

l.  Be aware of rooms with excess condoms, lubricants, and towels and report these indicators to management. [68]

55.  The U.S. Department of State also lists the following "red flags" of human trafficking, including: signs of malnourishment, poor hygiene, fatigue, sleep deprivation; individuals lacking freedom of movement or being constantly monitored; significant foot traffic in and out of the room; men traveling with woman who appear significantly younger; woman dressed inappropriately for their age; extended stays with few or no personal possessions; rooms rented hourly; the same person reserving multiple rooms; and excessive amounts of sex paraphernalia (condoms, lubricants, etc.).[69]

56.  Although both Defendants are signatories to the Code[70] and thereby promised to adopt these policies to combat sex trafficking within their brand hotels, Defendants have repeatedly failed

---

[68] ECPAT-USA Anti-Trafficking Hotel Checklist, https://static1.squarespace.com/static/594970e91b631b3571be12e2/t/5cd329e8a4222f20baf5378b/1557342696892/ECPAT-USA_Anti TraffickingHotelChecklist.pdf (last visited Aug. 19, 2021).

[69] U.S. Dep't of Homeland Security, *Human Trafficking and the Hotel Industry*, https://www.dhs.gov/blue-campaign/hospitalityindustry (last visited Feb. 25, 2019).

[70] *See Our Code Members,* ECPAT, https://www.ecpatusa.org/code-members

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1 to implement or train their staff on these anti-trafficking measures.

2 57. Defendant Choice is a face and signatory to the ECPAT anti-trafficking knowledge,

3 guidance, and information necessary to prevent human trafficking, and Choice publicly committed

4 to participate in the programs shown to assist in identifying and preventing sex trafficking inside

5 its brand hotels.

6 58. Defendant Red Roof is a face and signatory to the ECPAT anti-trafficking knowledge,

7 guidance, and information necessary to prevent human trafficking, and Red Roof publicly

8 committed to participate in the programs shown to assist in identifying and preventing sex

9 trafficking inside its brand hotels.

10 59. Defendant Choice publicly committed to educating their brand hotels on human

11 trafficking and should not only have created effective Brand standards for implementation,

12 mandates, and operations, but enforced them.

13 60. Defendant Red Roof publicly committed to educating their brand hotels on human

14 trafficking and should not only have created effective Brand standards for implementation,

15 mandates, and operations, but enforced them.

16 61. Yet each Defendant individually failed and continues to fail to do so.

17 62. In contradiction to the Code, each Defendant freely allows unregistered guests to enter

18 their brand hotels and ignore red flag signs of sex trafficking.

19 63. Similarly, Defendants knew or should have known that traffickers inviting multiple

20 buyers per day to trample through the brand hotels were likely to request specific hotel room

21 accommodations such as rooms near external doors, rooms overlooking the parking lot, or rooms

22 further from view of the front desk.[71]

23 64. In addition, every day, thousands of brand hotel employees witness manifestations of sex

24

25 [71] *See, e.g.* Anthony, *supra* note 22 at 20 ("request[ing] room overlooking parking lot or not within view of front desk" is "[t]trafficking indicator" in hotels and motels); The BEST (Business Ending

26 Slavery and Trafficking) Trafficking Indicators for Lodging Establishments lists: "A person reserving a room and requesting a suspicious location (next to an exit, on the hall alone, etc.)" as a

27 potential indicator of sex trafficking in lodging establishments. http://www.bestalliance.org/uploads/5/0/0/4/50047795/indicators_-_labor_and_sex.4.nn.pdf (last

28 visited June 2, 2020).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1    trafficking and commercial exploitation.  Despite the Brands' greatest reach to prevent, identify,

2    and thwart this crime where it is most likely to occur at their properties, the Brands refuse to take

3    meaningful action to train their employees.[72]

4    65.    Training hotel staff to identify the signs of sex trafficking and sexual exploitation is a

5    critical and obvious legal obligation for the hospitality industry. The presence of sex trafficking

6    and sexual exploitation in a hotel is a frequent and obvious occurrence and, although unutilized,

7    underutilized, or ineffectively utilized, numerous well-researched trainings and toolkits have been

8    published and provided to the Brands over the past decades as resources for training their brand

9    hotel staff in every position to identify signs of sex trafficking.[73]

10   66.    From check-in to check-out, there are a number of indicators that traffickers and their

11   victims exhibit during their stay at a hotel. With proper training and the implementation of

12   reasonable security measures, the Brands could prevent regular sex trafficking within their walls.

13   67.    The global prevalence of sex trafficking is a direct result of under-attentive, untrained, or

14   unenforced practices by hotel operators failing to address sex trafficking red flags including but

15   not limited to: paying with cash, an excess of condoms and other indicia of sex in hotel rooms,

16   individuals carrying or flashing large amounts of cash, excessive cash stored in the room, renting

17   two rooms next door to each other or requesting rooms in more discrete areas of the hotel or near

18   side and back door entrances, declining in-room service for several consecutive days, ordering

19   additional towels and sheets at varying times, significant foot traffic in and out of room(s), men

20   traveling with multiple women who appear unrelated, or men who rent rooms for someone else,

21   women known to be staying in rooms without leaving, women displaying physical injuries or signs

22   of fear and anxiety, individuals checking in or arriving with little or no luggage, individuals who

23   prevent someone else from speaking for themselves, or individuals controlling another's

24

25

---

26   [72] *Combating Human Trafficking in the Hotel Industry*, HUFFPOST (Jul. 22, 2015),
     https://www.huffpost.com/entry/combating-human-trafficking-in-the-hotel-industry_b_7840754.

27   [73] Department of Homeland Security, *Hospitality Toolkit*, BLUE CAMPAIGN,
28   https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-
     eng.pdf (last visited Aug. 19, 2021).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1   identification documents.[74]

2   68.     Mandatory training on these red flags is a necessary step in combatting sex trafficking at

3   hotels.   Hotel staff who have undergone training are more aware of sex trafficking when it happens

4   and are more willing to report it than hotel staff who have not been trained.[75]

5   69.     The Brands can and must mandate that *all* staff working at *all* of their branded hotels

6   complete sex trafficking training.[76]

7   70.     The Brands are obligated to effectively train their staff, adopt anti-trafficking policies and

8   procedures, and enforce these measures as Brand standard in their branded hotels.

9   71.     Further in contradiction to The Code, each Brand requires their brand hotels to offer free

10  internet service by Brand approved internet providers who are sufficiently knowledgeable to

11  provide cybersecurity and prevent illegal activity from occurring at the branded hotels, but Brands

12  refuse to do so.

13  72.     The Brands provide their brand hotels with internet access and data to help enhance

14  customer service or otherwise permit the Brand to exploit data by other means.

15  73.     Internet access at their brand hotels is through two means.   First, the Brands provide

16  internet access to guests through wireless internet accessible in their branded hotel rooms.   Second,

17  the Brands provide internet access through publicly accessible wireless networks available in the

18  lobby and other common areas of their brand hotels.

19  74.     The Brands collect data on internet usage through the wireless internet services they

20  provide, including:

21          a.     The IP address, and other identifying information, for all devices that access the

22                 internet through the Brands' wireless networks;

---

[74] *Id.*; *see also* Shea M. Rhodes, *Sex Trafficking and the Hotel Industry: Criminal and Civil Liability for Hotels and their Employees*, The Institute to Address Criminal Sexual Exploitation, VILLANOVA UNIVERSITY SCHOOL OF LAW (2015), https://cseinstitute.org/wp-content/uploads/2015/06/Hotel_Policy_Paper-1.pdf.

[75] Giavanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY, SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[76] Rhodes, *supra* note 74.

24

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

b. The identity of websites accessed by those devices, through the IP addresses of the servers that host those websites; and

c. Information about the user accessing the internet including through the Brands' wireless networks, including the users' room number, a user-provided name, and other identifying information.

75. The Brands' internet access policies each purportedly prohibit the use of the internet access that they provide for unlawful purposes. However, in violation of their federal statutory obligations, the Brands fail to monitor internet use at their brand hotels and identify signs and perpetrators of commercial sex trafficking operating within their walls.

76. The Brands knew or should have known of the prevalent use of websites like Backpage.com, Craigslist.com, and other similar websites by traffickers to post advertisements for sex from within their brand hotels.

77. Despite such knowledge, the Brands made no effort to flag or block the use of such websites by traffickers and instead, sat willfully blind to the use of their wireless networks furthering sex trafficking within their brand hotels, including the hotels where J.M. was trafficked.

78. The Brands facilitated and encouraged sex trafficking at their brand hotels by allowing traffickers to post unlawful advertisements through the Brands' own wireless networks in violation of the Brands' purported own policies on the use of those networks.

**3. Defendants Prioritize Profits and Coordinate to Preserve their Public Image.**

79. For years, Defendants have made flagrant business decisions to contravene and reject universal guidance on effective anti-trafficking measures at their brand hotels.

80. The hospitality industry is controlled by a small number of powerful corporations ("Hotel Industry Leaders") with a handful of companies owning well over 90% of global hotel and motel properties. Indeed, human trafficking in hotels is a top-down problem in the hospitality industry, and Hotel Industry Leaders like the Defendants are in the best position to, and have a duty and responsibility, to set policies and procedures to combat human trafficking and comply with the TVPRA to protect survivors like J.M.

81. But rather than implement responsible and effective anti-trafficking measures and

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

training, Defendants collaborated to hire media professionals to make public claims to their investors and customers to "address" the longstanding problem of human trafficking at their hotels. Some examples include:

     a.  In a press release, Red Roof's president George Limbert stated: "We encourage all our partners and peers in travel and hospitality to join us and stand by ECPAT-USA in the fight against human trafficking.[77]

     b.  Choice similarly promotes its ECPAT-USA membership proudly on its website and promises to take a stand against human trafficking at its brand hotels.[78]

     c.  Choice made resources from the Blue Campaign available to its corporate and brand hotel staff;[79] however, these materials are not part of any mandatory training.

     d.  Choice formed a partnership with the Polaris Project where Choice fundraises for Polaris through its Choice Privileges rewards program.[80]

     e.  Defendants committed to the American Hotel & Lodging Association's (AHLA) 5-Star Promise of Safety and promised to strengthen safety and security policies, including those related to human trafficking.[81]

82. The Brands agree human trafficking is a problem globally, but not one Brand admits sex trafficking is a problem in their business or at their brand hotels.

83. Each Brand's "solution" to the problem is always the same—to give lip service about more employee training, and to identify some red flags related to trafficking. But this employee training has never occurred in earnest or *en masse*. For instance, according to ECPAT's reports, the actual number of employees trained by the Brands is abysmal.

---

[77] *See e.g.*, Ed Brock, *Red Roof Donates $10,000 TO FIGHT HUMAN TRAFFICKING* (2022), https://www.asianhospitality.com/red-roof-donates-10000-to-fight-human-trafficking/.

[78] *Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).

[79] *Id.*

[80] *Id.*

[81] *At brand conference, Red Roof execs signal growth*, HOTEL BUSINESS (2019), https://hotelbusiness.com/at-brand-conference-red-roof-execs-signal-growth/.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

84. One recent study found of "the major hotel brands surveyed, only two of twelve companies (20%) mandate human trafficking awareness and response training in their policies for franchised properties. A critical opportunity to improve awareness among millions of front-line personnel is therefore being missed."[82]

85. Moreover, although the training may provide some information in identifying trafficking, it provides no clear message on training that will serve to actively address or prevent human trafficking.

86. Upon information and belief, Red Roof and Choice held meetings among their executives, directors, and managers at which sex trafficking in their branded hotels was discussed.

87. Upon information and belief, reports on sex trafficking in the hospitality industry by the Polaris Project were received and reviewed by the executives, directors, and managers of Red Roof and Choice.

88. Upon information and belief, other publicly available information regarding sex trafficking in hotels was received and reviewed by Red Roof and Choice executives, directors, and managers.

89. Upon information and belief, Red Roof and Choice corporate employees exchanged emails related to the issue of sex trafficking in their brand hotels.

90. Upon information and belief, Red Roof and Choice were aware of national and international campaigns to combat sex trafficking within the hospitality industry.

91. In addition, Defendants are Hotel Industry Leaders within the global hospitality business. They magnify their influence and control through their memberships and activities in trade associations such as the American Hotel & Lodging Association ("AHLA")[83] where both

---

[82] KRISTINE ADAMS & MICHELLE GUELBART, ECPAT-USA, STAMPING OUT EXPLOITATION IN TRAVEL: BENCHMARKING THE TRAVEL INDUSTRY'S PROGRESS ON FIGHTING HUMAN TRAFFICKING AND THE COMMERCIAL SEXUAL EXPLOITATION OF CHILDREN 22 (2019).

[83] For more than 100 years, AHLA has been the foremost representative and advocate for the U.S. lodging industry and the only national association that represents all segments of an industry that is among the 10 largest business sectors in America. From major global brands to the small inns and bed & breakfasts, AHLA provides a singular voice that brings together the industry's multitude of

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1   Defendants are members. [84]

2   92.   Upon information and belief, Red Roof and Choice participated in meetings through its

3   trade organizations in which sex trafficking in their hotels was discussed.

4   93.   Upon information and belief, Defendants have served on executive committees or as

5   board members in AHLA[85] or other state and national associations since at least 2008.[86]

6   94.   The AHLA serves as a forum for Hotel Industry Leaders, including Defendants, to

7   discuss efforts related to human trafficking and serves as a voice from which Defendants can

8   address the issue with the public.

9   95.   To curry favor and a positive public image, Defendants use their memberships to

10  advertise policies, practices, and procedures that indicate a unified commitment to fighting human

11  trafficking.[87]

12  96.   Through these trade associations, Defendants disseminated very specific talking points

13  to provide to the government, law enforcement, the public, and the media. These talking points

14  amounted to nothing but spin whereby Defendants tote themselves as heroes while implementing

15  no genuine anti-trafficking efforts.  Yet these were more than advertising campaigns.  They were

16  part of a concerted effort to divert the attention of anti-trafficking stakeholders and lawmakers

17  away from Defendants and make assurances that the hotel industry, and Defendants specifically,

18  were meaningfully addressing the industry-wide problem of human trafficking (without the true

19

20  _____

21  constituents. AHLA is diverse and represents everyone from brand CEOs to independent hotel
    owners, general managers, and hotel staff and is an integral contributor to the American economy.
22  *See* American Hotel & Lodging Association, Who We Are, https://www.ahla.com/who-we-are (last
    visited Apr. 22, 2020).

23  [84] *See* American Hotel & Lodging Association, Our Members, https://www.ahla.com/our-members.

24  [85] *See* AHLA Announces 2020 Officers, Board, Executive Committee Amid Record Membership,
    AMERICAN HOTEL & LODGING ASSOC., https://www.ahla.com/press-release/ahla-announces-2020-
25  officers-board-executive-committee-amid-record-membership (last visited Aug. 19, 2021).

26  [86] *See* AMERICAN HOTEL & LODGING ASSOC., Association Members, *https://www.ahla.com/psa* (last
    visited Aug. 19, 2021).

27  [87] *See, e.g.*, NICHOLS, ANDREA J., SEX TRAFFICKING IN THE UNITED STATES: THEORY, RESEARCH,
    POLICY, AND PRACTICE (Columbia Univ. Press 2016) (citing American Hotel and Lodging
28  Association 2012 "Industry Principles to Combat Human Trafficking").

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

intention to do so).  By representing to the public and to legislators "the industry's ongoing commitment and work to end human trafficking" Defendants acknowledged and assumed their responsibility to meaningfully address human trafficking at their branded properties.[88]

97.     As industry leaders, Defendants each failed to articulate and enforce effective policies, processes, and procedures to measure and address the extent of the trafficking problem at their branded locations. Defendants instead perpetuated the lie that sex trafficking was not a problem at their brand hotels.  Moreover, Defendants failed to articulate or enforce an effective policy, process, or procedure that could measure whether their purported "employee training" had the effect of reducing instances or expected instances of human trafficking at their branded hotels.

98.     Unsurprisingly, Defendants collectively declined to implement anti-trafficking measures that would have the likely effect of reducing the billions of dollars in sex trafficking profits gained from renting hotel rooms to criminals for the purpose of criminal activity.  As a whole, Defendants and their colleagues did not call for stricter room rental requirements.  For example, Defendants did not require identification cards or names of every person staying in the room, did not limit the number of people allowed to stay in a single room, did not require a credit or debit card to be placed on file with a name on it (accepting prepaid credit cards and even cash for room rentals), and did not monitor reservation patterns maintained and owned by their own Brand central reservation systems (data which could only be analyzed by the Brands with their backend access).  In short, Defendants refused to communicate to the criminal traffickers: "Your business and your money are not welcome here."

99.     Through taking this coordinated effort, Defendants were able to rest assured they would not have to implement effective anti-trafficking measures and no Brand would lose business either in profits or publicity.  As trafficking is a $150 billion dollar business occurring primarily within the hospitality industry, there could be no doubt the industry and Defendants generate billions of dollars every year from the criminal sex trafficking trade occurring within their brand hotels.

100. Defendants' coordinated efforts with the Hotel Industry Leaders created an industry

---

[88] *See No Room for Trafficking*, AMERICAN HOTEL & LODGING ASSOC., https://www.ahla.com/issues/human-trafficking (last visited Aug. 19, 2021).

facade that steps were being taken to combat human trafficking while in practice implementing nothing meaningful or effective. Defendants guaranteed that they would not have to compete with a competitor brand that earnestly put together and enforced anti-trafficking measures at their brand hotels.

101. The risk to all Hotel Industry Leaders, including Defendants, in the venture is if any one of the Brands defects from the collective stance. A Brand is incentivized to implement an effective anti-trafficking program because, in the long term, it could gain a competitive advantage over the other Brands through inimitable goodwill in the eyes of the public and potential customers for being the first Brand to actually do so.[89] However, this competitive advantage is at the cost of implementing and maintaining the effective program and the loss of revenue currently generated by allowing sex trafficking to occur at their brand hotels, including through profits generated by room rentals. Moreover, this forgone revenue would likely go to the defecting Brand's *competitors* (the other Brand and Hotel Industry Leaders) who gained additional business from the traffickers the defecting Brand lost. Defecting from the collective stance to admit the Brand has a sex trafficking issue at its hotels could also tarnish the Brand's reputation, causing it to lose its status as an industry leader, and resulting in even greater lost profits. Thus, the optimal outcome for both Defendants, and all Hotel Industry Leaders, is to remain unified in their business ventures to never pay the costs of effective anti-trafficking measures and continue sharing the profits from the sex trafficking trade, whilst still maintaining their public images through thinly veiled PR stunts.

102. As part of their conspiracy save costs and continually reap millions of dollars in profits, Defendants failed to develop mandatory and comprehensive training to prevent human trafficking, failed to implement training to prevent human trafficking, and failed to conduct audits confirming

---

[89] While it would be challenging and expensive (both business expenses and lost revenues from traffickers or commercial sex) to implement effective policies, an effective policy would create a long-term competitive advantage for the individual Brand that first took action. A Brand business that implemented an effective policy could easily provide reportable data on how it reduced trafficking at its brand properties. Moreover, it could exploit the fact that other defendants are completely ignoring that a problem exists at their brand properties. The complying hotel could explain how other brand hotels will never be able to effectively battle the problem until they admit it exists on their properties. Thus, in the long run, an effective policy would generate public support and create brand loyalty, resulting in greater revenues and profits.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

Levin Simes Abrams LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

that training had been implemented and that human trafficking occurrences were being prevented on hotel properties. Defendants further failed to enact robust policies and practices to ensure continuous, directed action to combat human trafficking on their properties.

103. This remains true, despite the plethora of resources, recommendations, and trainings available to hotel industry professionals to combat human trafficking on their properties, which have been available for years.[90]

104. Defendants, and other Hotel Industry Leaders, fail to take the actions needed to combat the known scourge of human trafficking within their brand hotels. Defendants conspired together to perpetuate a false narrative absolving Defendants from responsibility of the human trafficking taking place with their permission and control. As such, Defendants, individually, and all Hotel Industry Leaders, collectively, advertised their condemnation of human trafficking, all the while jointly saving on costs associated with compliance with the TVPRA's non-delegable duty.

## C. THE BRANDS ARE PROPERLY NAMED DEFENDANTS ALIGNED WITH THE LEGISLATIVE INTENT IN ENACTING THE TVPRA CIVIL REMEDY

105. Aside from their unique position in this growing epidemic, Defendants have the highest obligation and statutory duty to protect their guests from known dangers, including sex trafficking and sexual exploitation. Defendants must be held accountable when they fail to uphold this obligation. As aptly stated in a publication by the Cornell University School of Hospitality, "the hospitality industry is undoubtedly involved in the sex trafficking industry…and therefore has an inherent responsibility to deter the crime and can be liable for failing to do so." [91]

106. In 2000, Congress first enacted the Victims of Trafficking and Violence Protection Act ("TVPA") to combat sex trafficking, prevent violence against women and children, and offer

---

[90] Organizations like the Polaris Project, ECPAT-USA, the U.S. Department of Homeland Security's Blue Campaign, and others provide countless resources, including toolkits and trainings, for hospitality industry professionals. *See e.g.*, *Hospitality Toolkit,* US Dep't of Homeland Security Blue Campaign (Jul. 20, 2016), https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.

[91] Giavanna L. C. Cavagnaro, *Sex trafficking: The Hospitality Industry's Role and Responsibility*, Cornell University, School of Hotel Administration 1 (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1   justice for survivors of modern-day slavery."[92]

2   107.  In each reauthorization since its enactment, Congress has maintained a strong intent to

3   provide adequate protection and recovery for victim survivors of trafficking against "the enormous

4   profitability of this industry."[93]

5   108.  Specifically, in 2003, over the objection of the Department of Justice, Congress chose to

6   add a civil remedy under section 1595 and broadly define the class of defendants who could be

7   sued in this private right of action.

8   109.  Then, when Congress passed the William Wilberforce Trafficking Victims Protection

9   Reauthorization Act of 2008 ("TVPRA") it again amended section 1595 to increase the capacity

10  of survivors to recover against anyone who "knowingly benefits, financially or by receiving

11  anything of value from participation in a venture which that person knew or should have known

12  has engaged in an act in violation of this chapter."[94]

13  110.  Congress has thus consistently expanded the TVPRA in an effort to deter sex trafficking

14  worldwide and provide a broad remedy for survivors.[95]

15  111.  In addition to Congressional amendments, the U.S. government has explicitly focused

16  extensive resources to combating trafficking within the hospitality industry and beyond.

17  According to President Joe Biden's National Action Plan to Combat Human Trafficking,

18  "facilitators such as *hotel* owners who knowingly profit from sex trafficking" should be

19

20  [92] TVPA Pub. L. 106–386, October 28, 2000, 114 Stat. 1464 (2000) (codified as amended in Title

21  22, Chapter 78, and Title 18, Chapter 77, of the U.S. Code); see also Markup of H.R. 2620 before
    House Int'l Affairs Comm., 108th Cong., 1st Sess., at 298 (July 23, 2003) (statement of Rep.

22  Christopher Smith).

23  [93] *Trafficking In Persons: The Federal Government's Approach to Eradicate This Worldwide*
    *Problem: Hearing on H.R. 2620 Before the Subcomm. On Human Rights and Wellness of the H.*

24  *Comm. on Gov't Reform*, 108th Cong. (2004) (statement of Rep. Dan Burton).

25  [93] 18 U.S.C. § 1595(a), Pub. L. No. 108-193, § 4(a)(4)(A), 117 Stat. 2878 (2003)

26  [94] William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008, Pub. L. No.
    110-457, 122 Stat. 5044.

27  [95] *See Roe v. Howard*, 917 F.3d 229, 242 (4th Cir. 2019) ("Viewed as a whole, the TVPA represents

28  a far-reaching congressional effort to combat transnational human trafficking on numerous fronts,
    including by expanding the civil claims and remedies available to its victims.").

"investigated and prosecuted."[96]

112.  J.M. was harmed by at least three responsible parties during her trafficking: (1) the criminal traffickers, (2) the brand local hotels and staff, and (3) Defendants named in this action. All three of these parties are jointly and independently responsible for the atrocities J.M. endured, and all three allowed, facilitated, encouraged, and forced her sex trafficking.  Yet only Defendants are inextricably linked to sex trafficking globally, have known for decades about their fault in the epidemic, and continue to harbor victims within their brand hotel rooms for their own benefit, despite obvious and available means to prevent it.

### D.  THE SEX TRAFFICKING OF PLAINTIFF J.M.

113.  J.M. first met her traffickers in approximately 2006 when she was twenty-five years old.

114.  By way of violence, threats, and induced dependence on illegal substances, J.M. was held captive and sold for sex by her traffickers from approximately 2006 through 2012.

115.  During this time, J.M.'s traffickers frequently rented rooms at the Defendants' brand hotel locations, including the Stockton Rodeway Inn® and Stockton Red Roof Inn®, because such rooms provided convenient, anonymous, and relatively central locations to which they could invite buyer "johns" without recourse.

116.  J.M.'s traffickers advertised her sale on illicit websites known for commercial sex and human trafficking, including but not limited to Red Book and Escort Review, at Defendants' brand hotels and over Defendants' internet servers.

117.  J.M. was sold and forced to perform sexual acts with many men each night until she met her traffickers' quota.

118.  Over the course of a grueling six years under the coercive control of her traffickers, J.M. was harbored at the Stockton Red Roof Inn® and Stockton Rodeway Inn® for weeks or months at a time on multiple different occasions.

119.  J.M.'s traffickers administered physical violence and withheld food and water to ensure

---

[96] *National Action Plan to Combat Human Trafficking,* THE WHITE HOUSE (Dec. 2021) 44, https://www.whitehouse.gov/wp-content/uploads/2021/12/National-Action-Plan-to-Combat-Human-Trafficking.pdf

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

Levin Simes Abrams LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

1  she could not escape from Defendants' brand hotels, including at the Stockton Red Roof Inn® and

2  Stockton Rodeway Inn®.

3  120. During her captivity, J.M. was subjected to rape, frequent physical and verbal abuse,

4  malnourishment, psychological torment, kidnapping, and false imprisonment, including at the

5  Stockton Red Roof Inn® and Stockton Rodeway Inn®.

6  121. Defendants and Defendants' brand hotel staff, permitted, facilitated, and profited from

7  J.M.'s trafficking at the Stockton Red Roof Inn® and Stockton Rodeway Inn®.

8  122. J.M. encountered Defendants' brand staff at the Stockton Red Roof Inn® and Stockton

9  Rodeway Inn® on numerous occasions and the same brand staff repeatedly ignored J.M.'s obvious

10 suffering and cause for concern.  Defendants' brand staff observed J.M.'s signs of deterioration

11 from repeated assaults by her traffickers and buyers, including visible bruising and physical and

12 verbal abuse occurring in public areas of Defendant's brand hotel properties.

13 123. Each buyer who arrived at Defendants' brand hotels to purchase sex from J.M.'s

14 traffickers was a nonpaying hotel guest and would routinely leave within hours of arrival.   The foot

15 traffic in and out of the rooms rented by J.M.'s traffickers occurred constantly and conspicuously.

16 124. At the Stockton Rodeway Inn®, J.M.'s traffickers followed a repetitive and routine

17 process which, alongside several other red flags, should or would have alerted Defendant Choice

18 and Choice's brand hotel staff to J.M.'s trafficking at their brand hotel.

19      a.  The Stockton Rodeway Inn® staff always witnessed J.M. being escorted by her

20          traffickers throughout the hotel.  J.M. was never alone.  Her traffickers also

21          controlled her identification documents, possessions, and money.  Every time J.M.

22          interacted with brand hotel staff at the Stockton Rodeway Inn®, it was readily

23          apparent that J.M. was under the control of her traffickers.

24      b.  On one occasion, a member of the cleaning staff heard three of J.M.'s traffickers

25          violently attack J.M. in the hotel room before witnessing one man drag J.M. down

26          the Stockton Rodeway Inn® hallway to a different room.  In this second room, the

27          trafficker continued his brutal assaults and could be heard from the open window.

28      c.  Later, the same witnessed staff member came to the door and asked if the hotel room

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

needed to be cleaned.  The staff member did not inquire about J.M.'s safety nor report the incident to security.

d.  Rather, a hotel guest who also witnessed the assaults reported the scene to the Stockton Rodeway Inn® front desk staff.  Nevertheless, the brand hotel staff allowed the traffickers to remain at the hotel, harboring J.M., and refusing to call the police.

e.  The staff at the Rodeway Inn® routinely received guest complaints related to the loud disturbances coming from the rooms where J.M.'s traffickers kept her.  In such circumstances, brand hotel staff would come to the room and request J.M.'s traffickers keep the noise level down.  On rare occasions when the hotel staff asked them to leave, J.M.'s traffickers would convince the staff to allow them to stay. Despite J.M.'s appearance, staff never inquired about J.M.'s safety.

f.  On several other occasions, J.M. was severely beaten by her traffickers in the public areas of the Stockton Rodeway Inn®, including the stairs and the parking lot which were in full view of the front desk and lobby.  These altercations were loud and disruptive as the beatings, banging, crying, and screaming for help were audible throughout the brand hotel.  Nevertheless, no brand staff member came to J.M.'s rescue, reported the assaults, or intervened to prevent future harm.

g.  During another stay, J.M.'s trafficker could be clearly seen talking with the police in the hotel parking lot.

125.  J.M.'s traffickers also followed a repetitive and routine process during stays at the Stockton Red Roof Inn® which, alongside several other red flags, should or would have alerted Defendant Red Roof and Red Roof's brand hotel staff to J.M.'s trafficking at their brand hotel.

a.  The brand hotel staff routinely granted J.M.'s traffickers request to rent a select room in the back of the hotel so as to not disturb the "regular" hotel customers.

b.  J.M. and her co-victims were regularly forced to solicit sex buyers on the Stockton Red Roof Inn® grounds, including in the hotel lobby and the parking lot.

c.  On numerous occasions, the Red Roof Inn® security guards told the buyers to "hurry up" as they came in and out of the room where J.M. was held.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

d. Although these security guards would often threaten to call the police, no one ever did.  Nor did these hotel staff ever ask J.M. or her co-victims if they needed help.

e. J.M.'s traffickers routinely engaged in violent and loud altercations in the Stockton Red Roof Inn® hotel rooms where she was held.  Such assaults resulted in yelling, beatings, banging, crying, and screaming for help throughout the brand hotel.

f. In one instance after observing J.M., her co-victims, and their traffickers at the Stockton Red Roof Inn®, the brand hotel staff boldly told J.M.'s traffickers to "be discreet" in their criminal activity.

126. J.M. and her co-victims were raped and otherwise sexually assaulted, abused, and harassed hundreds upon hundreds of times at Defendants' brand hotels, including the Stockton Rodeway Inn® and Stockton Red Roof Inn®.

127. She and her co-victims were visibly deteriorating.

128. An inordinate number of towels were requested and used alongside other obvious indicia of sex trafficking within the rooms, such as used condoms, lube bottles, lingerie, sex toys and related items.

129. J.M. and her co-victims were seen in and around the Defendants' brand hotels forced to wear inappropriate attire.

130. In addition to staff, security, and guest witnesses, security cameras at the Defendants' brand hotels undoubtedly filmed a great deal of this obvious foot traffic.  Yet this surveillance was never utilized to deter, prevent, or protect J.M. or her co-victims from the flagrant sex trafficking occurring at the Stockton Rodeway Inn® and Stockton Red Roof Inn®.

131. Defendants knew or should have known of the sex trafficking of J.M. and her co-victims at their brand hotels, including the Stockton Rodeway Inn® and Stockton Red Roof Inn®, due to, but not limited to:

a. Special room requests, including rooms away from other hotel guests, late check out, and/or single bedrooms despite multiple occupants;

b. Payments for rooms in cash;

c. Paying for extended stays on a day-to-day basis;

36

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

d.   Traffickers' complete control over J.M., her identification, and her money;

e.   Multiple occupants living out of the hotel room for extended stays;

f.   Solicitation of buyers in and around the hotel, including the lobby and parking lot;

g.   J.M.'s physical appearance, including as malnourished, bruised, beaten, with cigarette burns and other visible signs of prior physical abuse, drugged, and wearing inappropriate attire for the weather;

h.   The continuous procession of male buyers entering and leaving the room;

i.   Excessive requests for towels, sheets, cleaning supplies, and/or room service;

j.   Great quantities of used condoms, empty lube bottles, lingerie, sex toys, bodily fluids on the sheets and towels, and other sex-related items in the hotel rooms;

k.   Obvious signs of illegal drug use;

l.   Loud altercations and violent assaults, including in the hotel's public spaces;

m.   Audible pleas to brand hotel staff and guests for help;

n.   Direct employee encounters and witnessed accounts of J.M.'s suffering and trafficking in and around the brand hotels' premises;

132.   Despite these consistent red flag signs of trafficking which were readily noticeable—and noticed—by Defendants' brand hotel staff, J.M.'s traffickers were permitted to continue holding J.M. captive for the purpose of commercial sex at the Stockton Rodeway Inn® and Stockton Red Roof Inn®. J.M. received no assistance from any of Defendants' brand hotel staff during her captivity, and Defendants continued to rent rooms to her traffickers.

133.   The trafficking activities at Defendants' brand hotels were obvious and observed by hotel staff and guests. Defendants failed to implement and enforce effective anti-trafficking measures to protect J.M. from this apparent criminal activity occurring under their roofs.

134.   Prior to, during, and following the incidents described herein, Defendants had actual and/or constructive notice of drug dealing, prostitution, and/or general safety concerns at their brand hotels, including, but not limited to, at the Stockton Rodeway Inn® and Stockton Red Roof Inn®, through video surveillance and oral or written complaints regarding said suspicious activity. Defendants failed to take any actions to curtail these activities.

37

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

135.  The impact of being beaten, threatened, exploited, raped, sex trafficked, and ignored at Defendants' hotel properties has forever emotionally and physically injured J.M. who, despite the years since her escape, suffers immensely as a result of the horrors inflicted upon her at Defendants' brand hotels, including the Stockton Red Roof Inn® and Stockton Rodeway Inn®.

136.  Had Defendants been paying attention to these criminal activities and the apparent red flags in and around their brand hotels, it would have been impossible for them not to notice the victimization of J.M.

137.  Had Defendants not hewed to a common policy of harboring known and suspected human traffickers in exchange for their benefit, J.M.'s traffickers could not have successfully arranged the commercial sex transactions reinforcing J.M.'s continued captivity.

138.  Had Defendants not hewed to a common policy of actively ignoring red flag signs of ongoing human trafficking, the open and obvious signs of J.M.'s sex trafficking would or should have resulted in reporting J.M.'s trafficking to the Defendants, prevention of further room rentals to her traffickers, and a far earlier end to J.M.'s victimization at Defendants' brand hotels.

139.  Similarly, if Defendants' anti-trafficking efforts in training, policies, and procedures at the brand hotels were enforced and/or effective, it would have been impossible for J.M. to be repeatedly harbored and victimized under Defendants' so-called watchful eye.

140.  J.M.'s injuries are thus the direct and proximate result of the Defendants' maintenance of policies and procedures that they knew or should have known allowed and facilitated the trafficking of J.M. at the Stockton Red Roof Inn® and Stockton Rodeway Inn®, incentivized Defendants' employees to ignore the obvious signs of J.M.'s trafficking, and continued Defendants' profiting from the rental of rooms to known or suspected human traffickers for the explicit and apparent purpose of selling J.M. for commercial sex.

///

///

///

///

///

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

**E.  DEFENDANT BRANDS ARE DIRECTLY LIABLE FOR THEIR ROLE IN THE TRAFFICKING OF J.M. AT THEIR BRAND HOTELS J.M.**

141.  Red Roof and Choice have been on notice of repeated incidences of sex trafficking occurring at their branded hotels since as early as 2006 yet fail, and persist in failing, to fulfill their statutory responsibility resulting in commercial sex trafficking occurring at their branded hotels.

142.  Red Roof owns, supervises, and/or operates the Stockton Red Roof® where Plaintiff was trafficked.

143.  Choice owns, supervises, and/or operates the Stockton Rodeway Inn® where Plaintiff was trafficked.

144.  The Stockton Red Roof® and Stockton Rodeway Inn® may collectively be referred to as the "Brand Hotels."

145.  The Brands failed to train, implement and enforce any of their own anti-trafficking policy or policies to protect Plaintiff from being sex trafficked.

146.  The Brands failed to monitor and audit their branded hotels for incidences of commercial sex trafficking.

147.  The Brands could and should have exercised control over their branded hotels, including the Stockton Red Roof® and Stockton Rodeway Inn® by:

    a.  distributing information to assist employees in identifying human trafficking;

    b.  mandating a process for escalating human trafficking concerns within the organization;

    c.  providing checklists, escalation protocols and information to property management staff;

    d.  requiring employees to attend trainings related to human trafficking;

    e.  mandating new hire orientation on human rights and corporate responsibility;

    f.  mandating training and education to branded hotels through webinars, seminars, conferences, and online portals;

    g.  developing and holding ongoing training sessions on human trafficking; and

    h.  tracking performance indicators and key metrics on human trafficking prevention.

39

148. Despite having actual and/or constructive knowledge of the extensive commercial sex trafficking occurring at their branded hotels, including the Stockton Red Roof® and Stockton Rodeway Inn® where Plaintiff was trafficked, the Brands have repeatedly failed to stop or adequately address sex trafficking at their branded hotels.

149. Defendants are jointly and severally liable for Plaintiff's damages in this case.

150. Plaintiff's injuries are indivisible.

151. The TVPRA provides for joint and several liability.

**1. The Brands Knowingly Benefitted from Participation in Their Commercial Business Ventures with Their Branded Hotels.**

152. Red Roof and Choice knowingly benefitted from the sex trafficking of J.M. from participation in their commercial business ventures with their branded hotels, which the Brands retain significant day-to-day control over.

153. Through their business ventures with their branded hotels, Red Roof and Choice rented rooms to J.M.'s traffickers.

154. Red Roof and Choice all knowingly benefit from the sex trafficking of J.M., and other victims like her, and developed and maintained business models that attract and foster the commercial sex market for traffickers and buyers.

155. Red Roof and Choice knowingly benefit from their ongoing reputation for privacy, discretion, and the facilitation of commercial sex.

156. Red Roof and Choice knowingly benefit from receiving significant franchise fees and continuous royalties on their branded hotels' gross revenues.

157. Red Roof and Choice also knowingly benefit through strategic cost-saving measures, including refusing to mandate or monitor employee training on sex trafficking, declining to analyze or address data they received regarding criminal activity, safety, and other indicia of trafficking issues occurring at their branded hotels (while using the same data to enhance marketing and other profit-driven purposes), and choosing not to implement adequate security measures or employ qualified staff.

158. Red Roof and Choice enjoy the steady stream of income that the sex trafficking trade at

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1   their branded hotels brings to their bottom line.

2   159.  Red Roof and Choice also knowingly accept non-economic benefits from their business

3   decisions, including maintaining an ongoing reputation for privacy, discretion, and inattentiveness

4   which continues to attract traffickers and buyers, while also presenting to the public a false

5   corporate social responsibility mission to combat sex trafficking.

6   **2.  The Brands Participated in Commercial Business Ventures with Their Branded Hotels.**

7

8   160.  Red Roof and Choice participated in commercial business ventures with their branded

9   hotels.  The Brands and their branded hotels were aligned in a common enterprise involving risk

10  and potential profit.  This was a continuous business relationship between the Brands and their

11  branded hotels.

12  161.  The Brands either directly owned, operated, and controlled the Brand Hotels as

13  subsidiaries, or as franchises of the Brands.

14  162.  The Brands either directly control the Brand Hotels as subsidiaries or retained significant

15  control over the Brand Hotel franchises, including the power to mandate the implementation of a

16  vast array of Brand standards.

17  163.  The Brands lent their name and likeness to the franchised Brand Hotels and provided

18  numerous supports and mandates in the Brand Hotels' daily operations, including marketing,

19  reservation, vendor, and revenue requirements.[97]

20  164.  For the privilege of carrying the Brand's name and reputation, and for receiving

21  predetermined operating standards (rather than paying the cost to develop their own), the

22  franchised Brand Hotels paid the Brand a percentage of their total revenue.

23  165.  The Brand, on the other hand, exchanges the high risk that is inherent in owning an asset

24  like a hotel for the low risk associated with owning a franchise contract, while still profiting from

25  putting heads in beds at the franchised Brand Hotels.

26

27  [97] *See, e.g.*, *Aaron Hotel Group, LLC v. Holiday Hospitality Franchising, LLC*, No. 3:21-cv-00727

28  (D. Conn. filed May 27, 2021) (alleging an "unlawful scheme" of excessive business practices through which IHG/HHF controls its franchisee branded hotels).

**3. The Brands' Business Venture Violated the TVPRA by Harboring Sex Trafficking Victims, Including J.M.**

166. Red Roof and Choice actively participated in business ventures which knowingly or negligently provided lodging to buyers purchasing illegal sex and harbored J.M. while she was being trafficked.

167. The Brands' business ventures rented rooms to J.M.'s traffickers.

168. The Brands' business ventures harbored J.M. in those rented rooms while she was forced to engage in commercial sex acts to numerous buyers and unregistered guests entering the branded hotels for this explicit and apparent purpose.

169. The Brands and the Brand Hotels, including their employees, knew or should have known J.M. was being trafficked for the purpose of commercial sex in the Brand Hotels and that they were benefitting from that criminality in violation of TVPRA § 1591(a).

170. The Brands had the opportunity to stop J.M.'s traffickers and other criminals like them from victimizing J.M. and others like her. Instead, each Brand implemented business ventures which failed to take reasonable measures to stop sex trafficking from occurring in their branded hotels.

171. The Brands failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security measures to improve awareness of sex trafficking and/or prevent sexual exploitation at their branded hotels or help J.M.

172. These failures were deliberate choices made by the Brands to conduct business ventures that facilitated, rather than prevented, sex trafficking in their branded hotels.

**4. The Brands Had Actual or Constructive Knowledge of J.M.'s Victimization at Their Branded Hotels.**

173. The Brands knew or should have known that the business ventures they compel in their branded hotels necessarily permit and facilitate sex trafficking, and J.M. was harmed, by design, from those strategic business decisions.

174. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because they have been on notice of the pervasive issue and centrality of their hotels as sex trafficking

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

42

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1   havens for decades.

2   175. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

3 they joined numerous national and international efforts to combat sex trafficking within the

4 hospitality industry.

5   176. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

6 they received and reviewed ample resources instructing best practices and training warning signs

7 to use within their businesses.

8   177. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

9 the Brands *claimed* to implement anti-trafficking measures based on the resources provided.

10   178. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

11 of all the specific warning signs inherent in her trafficking at the Brand Hotels, including but not

12 limited to: employee interactions, constant foot traffic, paying and displaying cash, criminal arrests

13 on the Brand Hotel property, specific room requests, visible injuries and inappropriate attire,

14 indicia of sex trafficking within the rooms, unusual housekeeping requests, and security monitoring

15 of premise.

16   179. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

17 they have centralized control over the hotel operating systems at the Brand Hotels, including

18 reservations, internet, and reviews, where the Brands should have been alerted to the ongoing

19 criminal activity.

20   180. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

21 the Brands provide a platform for branded hotel employees to report suspicious activity occurring

22 at their branded hotel, including suspected human trafficking. The Brands control and house this

23 collective data from all branded properties.

24   181. The Brands' access included branded hotels' guest information registration, including

25 names, date of booking, and length of stay. The Brands can thus see unusual or suspicious

26 bookings, for instances, when clientele are disproportionately male for same-day bookings for one-

27 night stays, when bookings rotate somewhat uniformly throughout its branded properties, when

28 reservations for extended stays were requested, or when cash payments are made.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

182. The Brands require their branded hotels to use a property management system, which are linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions. The Brands tracked and controlled data regarding guest information, including physical location of guests via their internet enabled devices, guest internet activity via their Wi-Fi services, and inventory information at each branded location.

183. The Brands require branded locations to follow cybersecurity protocols monitoring suspicious online activity by guests, and the Brands require the branded locations to report this information to the Brands' corporate management.

184. The Brands have the capacity to monitor and control brand property hotel guests' access through hotel Wi-Fi to certain websites. The Brands see when branded property hotel guests are accessing sex buyer advertisements and websites through hotel Wi-Fi, including Plaintiff's advertisements on Backpage, because the branded locations share this information with the Brands' corporate management.

185. The Brands have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking. Nevertheless, the Brands do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human traffickers.

186. The Brands regularly conduct inspections of branded locations to ensure compliance with Defendant's corporate policies governing Guest Safety, Security, Human Rights, Ethics, and compliance with the law, with the ability to penalize the branded property for failure to comply. These inspections could and should have included more robust protections for identifying signs of human trafficking and protecting victims like J.M.

187. The Brands' brand standards are so strict as to entirely bar certain efforts to combat trafficking, for instance by prohibiting the prominent placement of informational signs within hotel rooms offering to help victims escape.

188. The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels by training their Brand Hotel employees to identify and address the obvious signs of sex trafficking

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1    when they occurred at the Brand Hotels.

2        189.  The Brands control training policies at their branded locations, including the decision to

3    mandate human trafficking training.  The Brands failed to develop mandatory and comprehensive

4    training to prevent human trafficking and failed to conduct audits confirming that training had been

5    implemented.

6        190.  The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels by

7    executing and enforcing policies, practices, and procedures at the Brand Hotels which effectively

8    protected J.M. from being repeatedly trafficked at the Brand Hotels.

9        191.  The Brands knew or should have known of J.M.'s trafficking at the Brand Hotels because

10   the Brands required their branded properties to regularly monitor and report incidents regarding

11   safety and security to the Brands, including but not limited to suspected human trafficking,

12   disturbances, altercations and other instances of violence, staff and guest involvement in illegal

13   activities, dismissal of guest from the property, and law enforcement calls and visits.  The Brands

14   regularly review these reports from their branded properties, including the Brand Hotels where

15   J.M. was trafficked, as part of compliance with health and safety protocols.

16       192.  The Brands knew or should have known of J.M.'s trafficking because they failed to

17   implement and enforce effective anti-trafficking measures in their business ventures that would

18   have protected J.M. and/or actively chose to follow business practices which they knew or should

19   have known benefitted them from J.M.'s sex trafficking at the Brand Hotels.

20       193.  On information and belief, these procedures were all in place at the Brand's properties,

21   including the Brand Hotels, and additional information garnered from them was also under the

22   Brands' management and control during J.M.'s trafficking period.  This data included data on both

23   J.M and her traffickers, including the details of J.M.'s check-in, the internet activity associated

24   with her reservation, including advertisements posted during her stay, her location at the hotel, the

25   spike in requests for towels and other items from inventory, and other specific data and information

26   related to the signs of J.M.'s trafficking.

27       194.  The Brands implemented processes to monitor various guest reviews and complaints,

28   indicating prostitution, human trafficking, violence, and guest safety at its branded locations.  The

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

1    Brands monitored these complaints and reviews from the locations where the Plaintiff J.M. was

2    trafficked, and those hotels in the surrounding area.

3    195. The Brands also have access to public police reports, news reports and internal reports

4    generated by customer and employees, regarding sex trafficking at their own hotel locations in

5    particular. The Brands have access to public outcries on platforms such as Twitter that garner

6    support for initiatives, such as petitions on Change.org.

7    196. A brief examination of just a handful of examples for each Defendant suffices to show

8    the extraordinary frequency with which Defendants have long received and continue receiving

9    evidence and reports that human trafficking runs rampant at their brand hotel locations:

10                                    **RED ROOF INN**

11        a.  Regarding a June 2012 stay at the Red Roof Inn, a customer said: "WORST HOTEL

12            I'VE EVER STAYED IN MY LIFE!!!!! My family took a road trip from southern

13            California to Yosemite. We usually take one big vacation a year. We booked our

14            hotel in advance, we had 3 rooms. Because of our road trip we didn't arrive until 10

15            pm that night when we arrived there were about 5 prostitutes outside with pimps.

16            We were so frightened we drove around for 30 minutes trying to cancel our stay

17            and because it was after 6 pm they wouldn't allow us to cancel. I'm positive the

18            owner has some sort of deal with the drug dealers and pimps there is no way he

19            doesn't know this is going on. They don't even try to hide it!. After delegating with

20            our families (it was 15 of us in a 15 passenger van) we were so exhausted we

21            decided to sleep a couple of hours and leave at dawn. I was so afraid we would get

22            our van stolen I parked it in front of the office and took my 1 year old daughters car

23            seat in the room with me. I was so upset by this time I went complain at the front

24            desk and of course the receptionist said the manager was not there and there was

25            nothing she could do with out his approval. That she would try to give us a 20.00

26            discount, which of course we never saw. IF YOU VALUE YOUR LIFE STAY

27            AWAY FROM THIS PLACE AT ALL COSTS!!!!!!!"

28    ///

Levin Simes Abrams llp
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

b.  Regarding a November 2012 stay at the Red Roof Inn, a customer said: "Horrible, was scared for our lives. My mother and I were moving from washington to california and after all day driving we finally found a hotel online, the red roof inn. When we got there it seemed okay right after we checked in two men came out and just kept watching us, and one starts following us. We decided to go to dinner but felt so uncomfortable we brought our electronics with. While we were gone we did more research and the day before someone had been murdered there. We came back and found two men around one of our vehicles and what looked like casing it. During the short time there we also saw drug dealing and prostitution in the parking lot. We went back to the room and looked around the sheets were dirty the bathroom was gross. So we decided we'd leave and because after 6pm we couldnt get a refund. We spent the night sleeping in our car at a rest stop where we felt safer at than that hotel. Do not stay here! Worst mistake!"

### CHOICE

a.  Regarding a 2014 stay at the Rodeway Inn by Choice at 339 S Wilson Way, Stockton, CA 95205, a customer said: "I went to this Rodeway Inn I would call it a HOTEL not Motel. I paid the manager my money to stay a whole week.. I went to check into my room and WILD LIFE CREATURES aka ROACHES were everywhere when I turned the lights on!! I walked right back down stairs and while I was walking to the managers office I was asked by a female with a low cut skirt on if I would be interested in entertaing her room. I told her no that im just here to go get my money back.. she then walked over to her car with a aka GORILLA PIMP pointing at me.. I was very disturbed and didn't know what to do!! I went to the office and the manger was argueing with me about me getting back my money! DONT GO TO THIS HOTEL."

b.  The Rodeway Inn by Choice at 339 S Wilson Way, Stockton, CA 95205, is permanently closed and other hotels/motels in the area were also shut down due to "A MOTEL KNOWN FOR PROSTITUTION ACTIVITY" only a minute away

from the Rodeway Inn.[98]

197.  The Brands maintain regular communication with the Polaris National Human Trafficking Hotline, ECPAT, Department of Homeland Security, law enforcement, and other trafficking-focus entities, to monitor which branded properties are located in high-risk areas for human trafficking.  The Brands regularly review this information to assess the risks of trafficking occurring within their operations.

198.  Despite years of access to information about training and well-established best practices, the Brands promised to fight human trafficking, but failed to take any steps to reasonably prevent sexual exploitation on their properties, including:

    a.  Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

    b.  Lowering operating costs and management costs by failing to analyzing the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

    c.  Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

    d.  Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex traffickers or buyers;

    e.  Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

    f.  Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation;

---

[98]  *Wilson Way 'House of Prostitution' Shut*, THE RECORD (Apr. 5, 2018), https://www.recordnet.com/story/news/crime/2018/04/05/wilson-way-house-prostitution-shut/985298007/.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

g.  Failing to provide or mandate checklists, escalation protocols and information to property management staff or tracking performance indicators and key metrics on human trafficking prevention;

h.  Failing to evaluate anti-trafficking measures for effectiveness and make changes where necessary; and

i.  Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

199.  Upon information and belief, the Brands' corporate employees developed policies, including those mentioned above, related to human trafficking for their branded properties, including security protocols, safety guidelines, training, best practices.  The Brands' corporate executives, directors, and managers held meetings, exchanged correspondence, and engaged in conversations through their trade organizations related to human trafficking procedures and policies at their branded properties.

200.  As a direct and proximate result of the Brands' egregious business practices, J.M. and millions of other survivor victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

## F.    DEFENDANTS ARE VICARIOUSLY LIABLE FOR THEIR ROLE IN THE TRAFFICKING OF J.M. AT THEIR BRAND HOTELS

201.  In addition to, and apart from, each Brands' direct liability under the TVPRA, the Brands are vicariously liable for the actions and inactions of their branded hotels.

202.  The branded hotels are agents of the Brands due to the systemic level of control the Brands' exercise over their branded hotels.

203.  The Brands lend their name and likeness to third party owners, while the building and operations are run by a franchisee or a third-party management company under the Brands' control. In return, the Brands exchange the high risk that is inherent in owning an asset like a hotel for the low risk associated with owning a franchise contract which still profits from putting heads in beds.

204.  The average consumer does not see this relationship. The Brands give the franchisee property the Brand's identity.  The Brands provide signage within and in front of the hotel property

that assures customers that when they check into that branded hotel they can expect that Brand's standards. This notion is reinforced throughout the branded hotel as the Brand is emblazoned on everything from the pens on the bedside tables to the staff uniforms at the front desk.

205. In addition to Brand recognition and expectations, the Brand provides a marketing organization and hotel listings in the Global Distribution System (GDS) and other online travel agency databases. The Brand also provides the branded hotel with access to its Brand-wide central reservation system, 1-800 phone number, revenue management tools, world-class loyalty programs, and a website. Thus, booking and room reservations are controlled by each corporate parent Brand.[99] The Brands see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[100]

206. The Brands also require their branded hotel properties to use a property management system, which is linked to the Brands' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

207. These third-party owned branded hotels typically pay around 10% of their total revenue back to the corporate parent Brand and is required to develop and maintain the hotel property in accordance with the Brand's standards as they are laid out in the franchise agreement.

208. Per the contract or franchise agreement, the Brand may enforce these standards through periodic inspections and even termination of the agreement if the branded hotel is found to be inadequate. However, kicking a delinquent branded hotel out of their system is at the expense of terminating the Brand's royalty payments, fees, and reputation.

209. The right of each Brand to enforce their brand standards is also their responsibility.

210. At the time of the incidents alleged herein: Defendant Red Roof owned, supervised, and/or operated the Stockton Red Roof ® and Defendant Choice owned, supervised, and/or

---

[99] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel-industry/.

[100] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

operated the Stockton Rodeway Inn®.

211. Red Roof and Choice have control and have exercised control over their branded hotels with respect to day-to-day issues in hotel operations, and also specifically, with regard to policies and procedures on human trafficking.

212. Moreover, the Brands exert dominion and control over the day-to-day operations at their branded hotels in a number of areas beyond that which is necessary to maintain Brand standards. For example, Choice branded hotels must provide a continental breakfast each day and Choice specifies the food and drink to be provided.[101]

**RED ROOF**

213. Upon information and belief, Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

    a. providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

    b. providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

    c. providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

    d. providing and controlling customer review and response platforms;

    e. hosting online bookings on Red Roof Inn's domain;

    f. requiring branded hotels to use Defendant Red Roof's customer rewards program;

    g. requiring branded hotels to use Defendant Red Roof's property management software;

    h. requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

    i. providing IT support for all property management systems, owned, operated, and

---

[101] *See Choice Hotels International, Inc. v. Patel et. al.*, No. 06:12-cv-00023, ECF No. 1, Attachment #29 (S.D. Tex. November 18, 2011).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

required by Red Roof;

    j.   setting employee wages;

    k.   sharing profits;

    l.   standardizing training methods for employees;

    m. building and maintaining the facility in a manner specified by the owner;

    n.   standardized or strict rules of operation;

    o.   regular inspection of the facility and operation by owner; and

    p.   fixing prices.[102]

214. Red Roof uses a centralized reservation system, and states in its privacy policy that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[103]

215. Red Roof requires its hotels to use a consolidated IT system and database for property management, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[104]

216. Red Roof requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place, including those that gives Red Roof the ability to access and harvest that internet data.[105]

217. Red Roof posts job openings for its branded properties on its central career positing website.[106] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.

---

[102] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[103] *See Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).

[104] *See Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022)

[105] *See Red Roof Inn Case Study*, SIGMAWIFI, https://www.sigmawifi.com/red-roof-inn-nh-case-study/ (last visited Jun. 10, 2022).

[106] *See Paint the Town Red*, RED ROOF, https://www.redroofjobs.com/ (last visited Jun. 10, 2022).

218. Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

a. Requiring the branded locations to use Choice's property management system.

b. Gathering reports of data generated by branded locations including reservation, payment, and occupancy information through Choice's centralized systems;

c. Requiring branded locations to keep audit reports and other records;

d. Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e. Providing marketing requirements and standardized marketing services for the branded locations;

f. Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g. requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h. Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i. Providing training and orientation materials for branded property staff;

j. Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k. Regulating the rates for room rentals; and

l. Insurance coverage requirements.

219. Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[107]

---

[107] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about (last visited Jun. 10, 2022).

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

220.  Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[108]

221.  Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[109]

222.  Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

223.  Upon information and belief, Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law.

224.  Defendants and their branded hotels exhibit a significant degree of interrelated, intermingled, and unified operations at the locations at which Plaintiff was trafficked as to show an agency relationship between Defendants and their branded locations.

225.  Under federal labor regulations, Defendants are each considered joint employers of the employees at their locations at which Plaintiff was trafficked. It is further a standard practice in the hospitality industry, upon information and belief, followed by both Defendants, for parent companies to exercise significant control over the employment decisions of their brand hotels. Upon information and belief, Defendants promulgate policies, procedures, and standards governing the hiring, training, retention, and advancement of on-the-ground employees and setting their rates of pay, which together exert significant control over all employment decisions made at the individual hotel locations at which Plaintiff was trafficked.

226.  Defendants are aware that human trafficking occurs at their branded hotels and know how their branded hotels deal with it.

227. Yet Defendants failed to develop effective policies and/or failed to implement and

---

[108] *Id.*

[109] *Choice Hotels International, Inc. Privacy & Security Policy*, CHOICE HOTELS, https://www.choicehotels.com/legal/privacy-policy.

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

enforce their own policies and procedures to protect Plaintiff and others from being sex trafficked within their walls.

228. Despite having actual and/or constructive knowledge of the extensive prostitution and sex trafficking that occurs at their branded hotels, including the trafficking of J.M. at the Brand Hotels, Defendants have repeatedly failed to prevent or adequately address commercial sex trafficking at their hotels.

229. Defendants exercise actual control over their branded hotels through mandatory Brand standards reflected in their contractual agreements for each hotel operation. The Brands exercise, or could exercise, their control over their branded hotels by:

      a.  distributing information to assist employees in identifying human trafficking;

      b.  mandating a process for escalating human trafficking concerns within the organization;

      c.  providing checklists, escalation protocols and information to property management staff;

      d.  requiring employees to attend trainings related to human trafficking;

      e.  mandating new hire orientation on human rights and corporate responsibility;

      f.  mandating training and education to branded hotels through webinars, seminars, conferences, and online portals;

      g.  developing and holding ongoing training sessions on human trafficking; or

      h.  tracking performance indicators and key metrics on human trafficking prevention.

230. The Brand Hotels where J.M. was trafficked were and are the actual and apparent agents of the Brands and together, they offer, or offered, public lodging services in the branded hotels.

231. The Stockton Red Roof® is an agent of Red Roof.

232. The Stockton Rodeway Inn® is an agent of Choice.

233. This agency relationship was created through each Brands' exercise of an ongoing and systemic right of control over the operations at the Brand Hotels, beyond that which is necessary to maintain Brand standards, including the means and methods of how the branded hotels conducted daily business through one or more of the following actions:

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

a.  Hosting online books on the Brand's domain;

b.  requiring branded hotels to use the Brand's customer rewards program;

c.  setting employee wages at the branded hotel;

d.  making employment decisions at the branded hotel;

e.  advertising for employment at the branded hotel;

f.  sharing profits with the branded hotel;

g.  providing standardized training methods for employees at the branded hotel;

h.  building and maintaining the structure of the branded hotel;

i.  mandating standardized or strict rules of operation;

j.  authorizing Brand inspection of the branded hotel and operation by the owner;

k.  fixing prices at the branded hotel;

l.  developing uniform and consistent policies regarding the prevention of commercial sex trafficking at the branded hotel, including a risk management process to identify, prevent, and mitigate risks for commercial sex trafficking105; and/or

m.  other actions that deprived the branded hotel of independence in the business operations at the hotel.

234.  An apparent agency relationship also existed and exists between the Brands and their branded hotels, including the Stockton Red Roof® and the Stockton Rodeway Inn® because the Brands hold their branded hotels out to the public as possessing authority to act on their behalf and by their Brand standards.

235.  In particular, the Brands are vicariously liable for the conduct of their branded hotel agents because traffickers, including J.M.'s traffickers, relied on each Brand's ineffective and/or unenforced anti-trafficking measures when selecting to trafficking victims at the branded hotels.

236.  The branded hotel employees observed obvious signs of sex trafficking and/or were aware of J.M.'s, and others, plight, yet failed to identify, protect, or prevent her from further victimization on their properties.  Each Brand's policies and procedures were either inadequate to prevent her trafficking or were not properly implemented due to lack of training, education and or enforcement by the Brands.

237. If the branded employees were aware of J.M.'s trafficking, pursuant to each Brand's corporate-wide policies, the employees would have reported such activity directly to the Brand, including but not limited to, illegal website use, booking and reservation history, payment by cash for several rooms at a time and visits from multiple buyers throughout the day.

238. The Brands were not only aware of J.M.'s trafficking, but also the failures of their own training, policies, and procedures to protect her and prevent trafficking at their branded hotels.

239. Given the Brands' public statements on behalf of their branded hotels and the control they assumed in educating, implementing, and directing their hotels, including the Brand Hotels, the Brands breached their duties in at least the following ways:

a. failing (altogether or adequately) to distribute information to assist employees in identifying human trafficking;

b. failing (altogether or adequately) mandate a process for escalating human trafficking concerns within the organization;

c. failing (altogether or adequately) to provide checklists, escalation protocols and information to property management staff;

d. failing (altogether or adequately) to require employees to attend trainings related to human trafficking;

e. failing (altogether or adequately) to mandate new hire orientation on human rights and corporate responsibility;

f. failing (altogether or adequately) to mandate training and education to branded hotels through webinars, seminars, conferences, and online portals;

g. failing (altogether or adequately) to develop and hold ongoing training sessions on human trafficking; or

h. failing (altogether or adequately) to track performance indicators and key metrics on human trafficking prevention.

240. Despite the Brands' ability to kick delinquent branded hotels out of their system, this action is seldom taken as it would come at the cost of their own profits. Nevertheless, this consequence is available to the Brand and illustrates the Brand's actual control over—and liability for—the branded

57

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

hotels' conduct when confronted with known, and readily knowable, signs of sex trafficking at their hotels.

241. The Brands accepted the profits from J.M.'s trafficking at their branded hotels even though such receipt may have been in violation of their own anti-trafficking policies and procedures.

242. The Brands knew or should have known that such profits were derived from the criminal sex trafficking of J.M. at their branded hotels, including the Stockton Red Roof® and Stockton Rodeway Inn®.

243. Had the Brands earnestly enacted and ensured anti-trafficking measures at their branded hotels—as they were capable and culpable for so doing—J.M.'s continued trafficking would not have been possible.

244. Their rooms would not have been rented for her victimization; nor would they have profited off her pain.

245. Rather, each Brand's acceptance of these profits and protected public image was affirmation of their intended business venture with their branded hotels.

## G. DEFENDANTS' UNIFIED COMMITMENT TO HARBORING TRAFFICKERS

246. Defendants and the other Hotel Industry Leaders have long engaged in a coordinated campaign to divert negative attention and preserve the profits the hospitality industry derives from its regular provision of accommodation to human traffickers, thereby ensuring that each industry participant remains complacent and rents rooms to human traffickers with roughly the same frequency as its peers.

247. Defendants have arrived at an understanding, whether explicit or tacit, that it is in the financial interest of the industry as a whole for all of its members to refrain from taking concrete, meaningful steps to identify human trafficking at their locations, and prevent the rental of rooms for the purpose of human trafficking. This is because:

        a. Defendants understand human trafficking is a significant revenue source for the industry as a whole, and a substantial decrease in the patronage of hotels by human traffickers would harm room rentals and revenue in the lodging industry;

        b. Defendants also understand that if any individual Defendant or other major chain

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

were to take concrete, meaningful steps to combat human trafficking, that entity would bear significant costs in lost revenue, combined with initial training and compliance costs, but would thereafter experience a significant competitive advantage and valuation for its brand and properties by investors, resulting from its increased reputation and decreased financial risk of liability;

c.  Defendants understand that any such competitive advantage would be temporary because other industry participants would be compelled, in order to stay competitive and viable, to follow suit in taking such concrete, meaningful steps; and

d.  Defendants understand that this would have the effect of closing human traffickers out of the hotel industry and significantly decreasing the prevalence of human trafficking generally, thereby decreasing the profits of all industry participants.

248.  Upon information and belief, Defendants are aware of public and private investors' criteria for valuing a company, including risks and liabilities for litigation and compliance with the TVPRA.

249.  On information and belief, both Defendants are members of the American Hotel and Lodging Association ("AHLA"), which "is the largest national association solely representing all segments of the 8 million jobs the U.S. lodging industry supports, including hotel owners, REITs, chains, franchisees, management companies, independent properties, bed and breakfasts, state hotel associations, and industry suppliers… [and] proudly represents a dynamic hotel industry of more than 54,000 properties that supports $1.1 trillion in U.S. sales and generates nearly $170 billion in taxes to local, state and federal governments."

250.  Defendants are far from shy about the fact that the hotel industry acts in concert, through the auspices of the AHLA, with respect to its response to human trafficking. Indeed, they have recently taken to trumpeting this fact from the rooftops.

251.  For example, In September 2018, the AHLA issued a press release touting the recent public commitments of the CEOs of several major industry players, as well as, on information and belief, of senior representation of Defendants, to take certain limited steps to combat human trafficking as "an unprecedented show of unity within a fiercely competitive industry."

252.  In June 2019, the AHLA issued a press release announcing its new "No Room for

Levin Simes Abrams LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

Trafficking" initiative entitled "Hotel Industry Unites on New Campaign to Fight Human Trafficking."

253. In July 2019, the AHLA began running a commercial entitled "Unity," in which the narrator states, "We're taking a unified industry approach to save lives."

254. The AHLA webpage for that initiative currently advises industry participants that "Another way that your hotel can raise awareness with guests is through social media posts that highlight our industry's unified commitment to preventing human trafficking in hotels."

255. Defendants and the other Hotel Industry Leaders, acting through the AHLA, have thus voiced a unified determination to ensure that all employees are trained to recognize human trafficking and have access to the National Human Trafficking Hotline's telephone number.

256. However, the behavior of Defendants demonstrates that this "unified commitment" to a sharply limited training regimen represents an agreed-upon false standard for their individual efforts to combat human trafficking, rather than implementing meaningful change.

257. The actual number of employees trained under the "No Room for Trafficking" campaign and all prior industry initiatives relating to human trafficking is paltry. On information and belief, less than half of current front desk employees at each Defendants' respective brand hotel locations have been trained to recognize human trafficking.

258. This is despite AHLA's then-Vice-President for Government Affairs stating in 2017 stating that while "[t]he cost of training varies . . . it's definitely not burdensome."

259. Moreover, on reference and belief, nowhere in any of the trafficking materials promulgated through the auspices of the AHLA is any suggestion that Defendants will or should take key actions that would doubtlessly reduce human trafficking, such as: (1) mandating—as opposed to allowing for—their employees report suspected traffickers; or (2) forbidding their employees to rent rooms to known or suspected human traffickers.

260. On information and belief, neither Defendants, nor any other Hotel Industry Leader, requires training regarding human trafficking for all employees likely to encounter human trafficking, nor did any do so during the time Plaintiff was trafficked.

261. On information and belief, no Defendant has or had issued a policy requiring employees

to report suspected instances of human trafficking when Plaintiff was trafficked.

262. On information and belief, no Defendant has or had issued a policy forbidding employee from renting rooms to known or suspected human traffickers when Plaintiff was trafficked.

263. On information and belief, no Defendant has taken any other significant action to combat human trafficking that was not directly called for by the industry as a whole through the auspices of the AHLA.

264. In sum, the behavior of Defendants demonstrates façade programs and steps taken with at least a tacit "unified commitment" to limit government regulations and retain customer loyalty to brand hotels, while refraining from meaningful steps to end trafficking. Instead, standing behind the veil created by Defendants and the other Hotel Industry Leaders, Defendants chose to forgo mandatory policies that might have been more costly but would have had a meaningful effect on anti-human trafficking efforts at their brand hotels.

265. On June 29, 2019, Defendants attended AHLA's strategic roundtable "bringing together industry leaders, government partners . . . to underscore the industry's efforts around human trafficking." On information and belief, senior leadership of each Defendant, who are on AHLA's board of directors, participated in this roundtable under the heading of "industry leaders."

266. On information and belief, at or in the lead up to this roundtable, senior leadership for both Defendants discussed potential responses to human trafficking and specifically the possibility of going beyond recommending employee training for recognizing the signs of trafficking.

267. On information and belief, during these discussions, senior leadership for both Defendants collectively rejected that possibility, thereby demonstrating their unwillingness to implement and enforce effective anti-trafficking measures, and reinforcing their preexisting common understanding that recommending, let alone taking, further steps would be detrimental to the industry as a whole.

268. On April 22, 2015, AHLA issued an earlier set of guidelines on human trafficking substantially like its "No Room for Trafficking" campaign.

269. On information and belief, Defendants' senior leadership participated in discussions resembling those described above in participants, topics, and outcome that occurred in the lead-up to such issuance.

Levin Simes Abrams LLP
1700 Montgomery Street  Suite 250
San Francisco  California 94111
415.426.3000 phone • 415.426.3001 fax

Levin Simes Abrams LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

270.  The understanding among Defendants and the Hotel Industry Leaders would likely have collapsed in the event of the non-participation of a major industry player on the scale of any of the Defendants.

271.  In addition to acting together on a national level through the AHLA, the hotel industry, including Defendants, has acted together through its state organizations, in support of the same goals, namely touting a focus on certain limited training while preventing discussion of any mandatory action that might actually respond to, identify, and ultimately prevent human trafficking

## CAUSES OF ACTION

## COUNT I: 18 U.S.C. § 1595 ("TVPRA")

### (against both Defendants)

272.  Plaintiff incorporates each foregoing allegation.

273.  Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

274.  Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595.  Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating human trafficking through their participation in the harboring of Plaintiff and her traffickers for the purposes of commercial sex induced by force, fraud, or coercion.

275.  Defendants have benefited as a result of these acts, omissions, and/or commissions by keeping operating costs low, maintaining the loyal customer base that fuels the supply and demand of sex trafficking, and limiting mandatory regulations. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff.  The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

276.  Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

///

LEVIN SIMES ABRAMS LLP
1700 Montgomery Street Suite 250
San Francisco California 94111
415.426.3000 phone • 415.426.3001 fax

## COUNT II: CONSPIRACY TO VIOLATE THE TVPRA

### (against both Defendants)

277.  Plaintiff incorporates each foregoing allegation.

278.  At all relevant times, Defendants knowingly agreed, contrived, confederated, acted in concert, aided and abetted, and/or conspired to continue their longstanding practice of renting rooms to known and suspected human traffickers, long after the enactment of § 1595 rendered it illegal for them to profit from the same.

279.  For over a decade, Defendants, individually, jointly, and in conspiracy with each other as key leaders in the hotel and lodging industry and through common understanding and design, implemented a malicious, sophisticated, and deceptive two-pronged strategy to profit from ventures that they knew or should have known violated the TVPRA as described above.

280.  First, Defendants promoted themselves and their industry as dedicated opponents of human trafficking.

281.  Second, Defendants, pursuant to either an explicit agreement or an implicit understanding, each maintained and continues to maintain policies, procedures, and training protocols that create environments at their branded hotel locations in which it is understood and accepted that rooms shall be rented to known and suspected human traffickers and profit shall be derived therefrom.

282.  Defendants control nearly every aspect of operations, including employee management, at their branded hotel locations through a web of franchise agreements and brand quality standards.

283.  The staffing decisions at the individual hotel locations are sufficiently controlled by Defendants as to render staff at those locations' agents and joint employees of the brand manager Defendants and the individual hotel locations. *See M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 972 (S.D. Ohio 2019).

284.  The staff at individual locations, including the locations at which Plaintiff was trafficked, took affirmative action, as agents of the brand manager Defendants, to provide lodging to individuals who the staff and the brand manager Defendants knew or should have known were engaged in human trafficking.

285.  The staff took these actions in compliance with a set of policies, procedures, and training

protocols created, and subsequently maintained with few changes, by Defendants in the full knowledge that—and, upon information and belief, with the intent that—such policies, procedures, and training protocols would ensure that human traffickers continued to do business at Defendants' branded hotel locations thus generating profit for Defendants.

286. Moreover, upon information and belief, despite the overwhelming data possessed by, and available to, Defendants, Defendants individually, jointly and in conspiracy with each other willfully and maliciously used their influence, through the AHLA, over local, state and federal agencies to restrict the disclosure of and otherwise to mask material facts about the prevalence of human trafficking and the hotel industry's failure to act regarding the same.

287. As co-conspirators, Defendants are jointly and severally liable for Plaintiff's trafficking at every property. Defendants' conspiracy to maintain practices, policies and procedures that allowed Defendants' to financially benefit from unlawful commercial sex ventures and human trafficking.

288. Defendants' conspiracy kept Defendants, who knew or should have known about human trafficking at their California properties from taking meaningful action, resulting in significant injuries to Plaintiff and additional victims.

289. Defendants' conspiracy is a continuing conspiracy, and the overt acts performed in furtherance of the conspiracy's objective(s) are ongoing.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.  Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress; consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.   Attorneys' fees and expenses;

g.   The costs of this action;

h.   Pre- and post-judgment interest; and

i.   Any other relief the Court or jury deems appropriate

### **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: June 10, 2022

**LEVIN SIMES ABRAMS LLP**

/s/ Amanda J.G. Walbrun
Amanda J.G. Walbrun, Esq. (SBN 317408)
Brian J. Perkins, Esq. (SBN 315870)
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile:  (415) 426-3001
Email: awalbrun@levinsimes.com
Email: bperkins@levinsimes.com

**BABIN LAW, LLC**

/s/Steven C. Babin, Jr.
Steven C. Babin, Jr., Esq. (*pro hac vice forthcoming*)
(Ohio SBN 0093584)
22 E. Gay Street, Suite 200
Columbus, Ohio 43215
Telephone: 614-761-8800
Email:  steven.babin@babinlaws.com

*Attorneys for Plaintiff J.M.*