Brian J. Perkins, Esq. (SBN 315870)
Rachel Abrams, Esq. (SBN 209316)
Angela Nehmens, Esq. (SBN 309433)
LEVIN SIMES ABRAMS LLP
1700 Montgomery Street, Suite 250
San Francisco, California 94111
Telephone: (415) 426-3000
Facsimile:  (415) 426-3001
Email: awalbrun@levinsimes.com

Steven C. Babin, Jr., Esq. (*admitted Pro Hac Vice*)
Jennifer J. El-Kadi (*admitted Pro Hac Vice*)
Kristina Aiad-Toss (*admitted Pro Hac Vice*)
BABIN LAW, LLC
65 East State Street, Suite 1300
Columbus, Ohio 43215
Telephone: 614-761-8800
Email: steven.babin@babinlaws.com

Attorneys for Plaintiff J.M.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| J.M., an individual | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 2:22-cv-00672-KJM-JDP |
| | ) | |
| vs. | ) | |
| | ) | **SECOND AMENDED COMPLAINT** |
| CHOICE HOTELS INTERNATIONAL, INC; | ) | |
| AND RED ROOF INNS CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

///

///

*Levin Simes Abrams, LLP*
*1700 Montgomery Street, Suite 250*
*San Francisco, CA  94111*

**Levin Simes Abrams, LLP**
**1700 Montgomery Street, Suite 250**
**San Francisco, CA 94111**

## SECOND AMENDED COMPLAINT

COMES NOW, the Plaintiff J.M. ("Plaintiff" or "J.M."), by and through her undersigned counsel, and respectfully submits her second amended complaint for damages and makes the following averments.

## INTRODUCTION

1.      Plaintiff J.M. is survivor victim of sex trafficking. She brings this action for damages pursuant to the Trafficking Victim Protection Reauthorization Act, 18 U.S.C. § 1595 against Choice Hotels International, Inc. ("Choice") and Red Roof Inns, Inc. ("Red Roof") for benefiting from direct and indirect participation in the ventures that violated 18 U.S.C. § 1591 *i.e.*, renting rooms that they knew or should have known were used to harbor J.M. for the purpose of sex trafficking, and providing Wi-Fi  internet services to customers that were used to place advertisements to solicit customers that J.M. was forced to engage in commercial sex with.

2.      Under 18 U.S.C. § 1595, liability for damages extends to whoever participates in a venture that recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; where means of force fraud or coercion, will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years. *Id.*, and 18 U.S.C. § 1591. ]

3.      Most sex trafficking in the United States of America occurs within the hospitality industry at hotels and motels.

4.      Rather than taking timely and effective measures to stop profiting from this epidemic, Defendants choose to ignore the presence of sex trafficking on their branded properties, and instead profited millions of dollars from renting rooms, and acquired valuable customer data by providing free wifi services to customers.

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

5.      Defendants, make millions from participating in ventures that they know or should have known engage in violations of 18 U.S.C. § 1591(a) through renting rooms where sex trafficking victims are harbored night after night, and providing Wi-Fi that traffickers use to advertise and solicit victims for commercial sex acts. Defendants and traffickers have a mutually beneficial relationship, fueled by the sexual exploitation of victims.

6.      J.M.'s life story reads like a tragedy wherein she was forced to endure violence, trauma, exploitation, manipulation, threats, isolation, humiliation, and degradation.

7.      J.M. met a person that groomed her into trafficking. Ultimately, her trafficker came to control every aspect of her life. The defining factor of the relationship between J.M. and her trafficker, was that each night, J.M.'s trafficker forced her to have sex with men for money.J.M. was trafficked in hotels owned by Defendants[1] Choice Hotels International, Inc. ("Choice") and Red Roof Inns, Inc. ("Red Roof"). J.M.'s trafficker rented rooms at Choice and Red Roof hotels, and used force, fraud, and coercion to cause J.M. to engage in commercial sex acts with countless men. Put differently, every time J.M. stayed in one of Defendants' hotel rooms she was repeatedly raped multiple times a day, by dozens of different strange men.

8.      J.M.'s trafficker harbored J.M. at Defendants' hotels, and advertised her for commercial sex using the Wi-Fi services provided by defendants.

9.      Defendants profit from participation in the venture of renting rooms, and directly profited each time a room was rented for the purpose of harboring J.M. for sex trafficking.

---

[1] Throughout this Complaint, when Plaintiff refers to "Defendants," that statement is alleged as to all Defendants named in this action, including Wyndham and Red Roof. In the instances when Plaintiff alleges a fact as to only one Defendant, or some number of Defendants less than the total, the Complaint clearly names the Defendant to which the allegation is made.

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

10.     With respect to the venture of profiting by supplying rooms where J.M. was trafficked, Defendants acted directly, as the primary facilitator of the venture. Defendants engaged in marketing to attract participants (including J.M. and her trafficker) to the venture, Defendants controlled the pricing of rooms, Defendants maintained the central room booking systems and platforms, Defendants facilitated room reservations, Defendants provided the software and poi systems to charge for rooms, Defendants took primary responsibility for customer retention and rewards programs, Defendants profited directly for every room rented.

11.     After enduring unimaginable horrors, J.M. was able build up the courage to escape her hotel room prison and the grasps of her trafficker.

12.     For J.M. the road to recovery has come with many challenges. With courage and patience, J.M. has put in the time to work on herself and regain some semblance of the life that was stripped away from her as a result of her trafficking. But, sadly, J.M. will never fully recover the life she could have had.

13.     J.M. brings this lawsuit in an attempt to hold the Defendants that imprisoned her accountable for their role in her trafficking.

**PARTIES**

14.     Plaintiff J.M. is a natural person and a resident and citizen of Galt, California.

15.     Plaintiff is a victim of trafficking pursuant to 22. U.S.C. § 7102(17) and 18 U.S.C. § 1591(a), and a victim of a "severe form of trafficking" as defined under 22 U.S.C. § 7102(16).

a.      Due to the sensitive and intimate nature of the issues, Plaintiff J.M. requests that this Court grant a protective order pursuant to Fed. R. Civ. P. 26(c) to permit her to proceed under a pseudonym and to ensure that Defendants

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

maintain the confidentiality of Plaintiff's identity throughout the pendency of this lawsuit and after.[2]

b.    Generally, under the Federal Rules of Civil Procedure, pleadings must state the name of all parties.[3] However, there are exceptions when the issues involved are of a sensitive and highly personal nature.[4] For good cause, the Court may issue an order to protect a party or person from annoyance, embarrassment, oppression or undue burden or expense.[5]

c.    Here, granting pseudonym status and proceeding under seal is warranted because this litigation will involve the disclosure of stigmatizing sexual information, including rape. Plaintiff fears stigma from her family, friends, employer, and community if her true identity is revealed in the public record.

d.    Plaintiff should not be compelled to disclose her identity in order to maintain her privacy and safety. Plaintiff's privacy interest substantially outweighs the customary practice of judicial openness.[6]

---

[2] In cases where the plaintiffs have demonstrated a need for anonymity, the district court should use its powers to manage pretrial proceedings under Fed. R. Civ. P. 16(b), and to issue protective orders limiting disclosure of the party's name under Fed. R. Civ. P. 26(c), to preserve the party's anonymity to the greatest extent possible without prejudicing the opposing party's ability to litigate the case. *Does I thru XXIII v. Advanced Textile Corp.*, 214 F.3d 1058, 1069 (9th Cir. 2000).

[3] Fed. R. Civ. P. 10(a).

[4] A district court must balance the need for anonymity against the general presumption that the parties' identities are public information and the risk of unfairness to the opposing party. *See, e.g., M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir.1998); *James v. Jacobson*, 6 F.3d at 238 (4th Cir. 1993); *Doe v. Frank*, 951 F.2d 320, 323–24 (11th Cir.1992); *Doe v. Stegall*, 653 F.2d at 186 (5th Cir.); *see also Doe v. Frank* at 323 (11th Cir. 1992) (holding that a plaintiff should be permitted to proceed anonymously in cases involving matters of a highly sensitive and personal nature, real danger of physical harm, or where the injury litigated against would be incurred as a result of the disclosure of the plaintiff's identity).

[5] Fed. R. Civ. P. 26(c).

[6] *Does I thru XXIII, 214 F.3d* at 1068 (joining its 4th, 5th, 10th, and 11th sister circuits in holding that a party may preserve his or her anonymity in judicial proceedings in special circumstances when the party's need for anonymity outweighs prejudice to the opposing party and the public's interest in knowing the party's identity).

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

e.   Moreover, Defendants will not be prejudiced. Plaintiff will agree to reveal her identity to Defendants for the limited purpose of investigating Plaintiff's claims once the parties have entered into a protective order. Plaintiff simply seeks redaction of Plaintiff's personal identifying information from the public docket and assurances that Defendants will not use or publish Plaintiff's identity in a manner that will compromise her safety, personal life, personal relationships, or future employment prospects.

16.   **Defendant Choice Hotels International, Inc.** ("Choice") is one of the largest hotel franchisors in the world and offers its brand public lodging services through its affiliates, subsidiaries, and franchisees.  It is a Delaware corporation with its headquarters in Rockville, Maryland and can be served through its registered agent, United States Corporation Company, at 3366 Riverside Dr. Suite 103 Upper Arlington, OH 43221.

17.   Choice owns, supervises, manages, controls, and/or operates the Rodeway Inn located at 339 S Wilson Way, Stockton, CA 95205 ("Stockton Rodeway Inn")

a.   The Stockton Rodeway Inn by Choice is a Choice brand property.[7]

b.   Choice employees work throughout the Stockton Rodeway Inn by Choice. Choice employees work jobs including front desk and housekeeping. Choice is the principal with control over nearly every element of operations at the Stockton Rodeway Inn by Choice. Choice is directly, indirectly, and vicariously for the acts and/or omissions of the employees at its branded hotels, including the Stockton Rodeway Inn by Choice, where J.M. was trafficked.[8] Choice has an actual and apparent agency relationship with the

---

[7] *Our Brands*, CHOICE HOTELS, https://www.choicehotels.com/about/brands (last visited Jun. 9, 26 2022).
[8] See, e.g., *Revenue Management*, RED ROOF, https://www.redrooffranchising.com/revenue- management (last visited Jun. 9, 2022) (proclaiming "Our Team is an Extension of Yours").

-6-

physical property owner of the Stockton Rodeway Inn by Choice as to establish vicarious liability.

c. Choice controlled and dictated the actions and inactions of the Stockton Rodeway Inn by Choice through highly specific and detailed brand standards, policies, and procedures.

d. Choice knowingly benefited, or received something of value, from participation in the venture of (1) renting rooms where J.M. was harbored and forced to engage in commercial sex (Choice made money on each room), and from providing the Wi-Fi that was used by J.M.'s trafficker to place advertisements online soliciting customers to purchase commercial sex that J.M. was forced to  provide (Choice benefited from acquiring / gathering customer data). from gathering personal data from the Wi-Fi it provided to customers including J.M. and her trafficker.

e. Choice is subject to the jurisdiction of this Court because it regularly conducts business in California, including through the operation of numerous hotels in California like the Stockton Rodeway Inn, contracting to supply services in California. Choice has derived substantial revenue from services rendered in California.

f. Whenever reference is made in this Complaint to any act, deed, or conduct of Choice, the allegation is that Choice engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Choice.

**Levin Simes Abrams, LLP**
**1700 Montgomery Street, Suite 250**
**San Francisco, CA  94111**

18.   **Defendant Red Roof Inns, Inc.** is a publicly traded company. The company provides franchise opportunities for its hotel and motel brands. Red Roof purchases, owns, and manages a network of hotels and motels globally, primarily in the Midwest, Southern, and Eastern United States. Red Roof serves customers throughout the United States and other countries throughout the World.

19.   Red Roof is a global hotel brand with approximately 650 branded properties worldwide. It is a Delaware corporation, with its corporate headquarters and principal place of business at 7815 Walton Pkwy, New Albany, Ohio 43054. Red Roof maintains a registered agent in Ohio, and it can be served through its registered agent, Corporation Service Company, at 3366 Riverside Dr. Suite 103, Upper Arlington, OH 43221.

20.   Red Roof owns, supervises, manages, controls, and/or operates the Red Roof Inn located at 1707 W Fremont St, Stockton, CA 95203 ("Stockton RRI").

  a.   The Stockton RRI by Red Roof is a Red Roof branded property. [9]

  b.   Red Roof employees work throughout the Stockton RRI by Red Roof. Red Roof employees work jobs including front desk and housekeeping. Red Roof is the principal with control over nearly every element of operations at the Stockton RRI by Red Roof. Red Roof is liable, either directly, vicariously, or indirectly through an agency relationship for the acts and/or omissions of the employees at its branded hotels, including the Stockton RRI by Red Roof where J.M. was trafficked. Red Roof has an actual and apparent agency relationship with the physical property owner of the Stockton RRI by Red Roof as to establish vicarious liability.

---

[9] *Our Brands*, RED ROOF, https://www.redrooffranchising.com (last visited Jun. 9, 2022); *Red Roof Inn*, RED ROOF, https://www.redrooffranchising.com/red-roof-inn (last visited Jun. 9, 2022).

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

c.  Red Roof controlled and dictated the actions and inactions of the Stockton RRI by Red Roof through highly specific and detailed brand standards, policies, and procedures.

d.  Red Rook knowingly benefited, or received something of value, from participation in the venture of (1) renting rooms where J.M. was harbored and forced to engage in commercial sex (Red Roof made money on each room), and from providing the Wi-Fi that was used by J.M.'s trafficker to place advertisements online soliciting customers to purchase commercial sex that J.M. was forced to  provide (Red Roof benefited from acquiring / gathering customer data).

e.  Red Roof is subject to the jurisdiction of this Court because its corporate offices are headquartered in this district. In addition, Red Roof regularly conducts business in California, including through the operation of numerous hotels in California like the Stockton RRI, contracting to supply services in California. Red Roof has derived substantial revenue from services rendered in California.

f.  Whenever reference is made in this Complaint to any act, deed, or conduct of Red Roof, the allegation is that Red Roof engaged in the act, deed, or conduct by or through one or more of their officers, directors, agents, employees, or representatives who was actively engaged in the management, direction, control, or transaction of the ordinary business and affairs of Red Roof.

**JURISDICTION AND VENUE**

21.   This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States.

-9-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

22.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(3) because Plaintiff resides within this District and a significant part of the acts and omissions giving rise to the cause of action occurred in this District.

23.    The Court has personal jurisdiction pursuant to the William Wilberforce Trafficking Victims Protection Reauthorization Act ("TVPRA")

## FACTUAL BACKGROUND

### INTRODUCTION

24.    J.M. brings her claims against major hotel brand corporations for violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA") 18 U.S.C. § 1595(a).

25.    The TVPRA prohibits Defendants from profiting from any venture they know or should know involves a violation of § 1591, and thereby establishes a non-delegable duty of to exercise reasonable diligence and reasonable care.

26.    Under 18 U.S.C. § 1595, the TVPRA holds liable for damages whoever participates in a venture that recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person; where means of force fraud or coercion, will be used to cause the person to engage in a commercial sex act, or that the person has not attained the age of 18 years. *Id.*, and 18 U.S.C. § 1591.

27.    To save costs and continually reap millions of dollars in profits, Defendants generally failed to create, adopt, implement, and enforce adequate company-wide policies and procedures regarding suspected incidents of human trafficking at the branded properties. Furthermore, Defendants, did not train staff sufficiently on how to identify and respond to suspected human trafficking, failed to require training of all employees on human trafficking policies and procedures, and failed to conduct audits confirming compliance with policies and procedures.

28.     Defendants ignored reports and data on suspected incidents or occurrences of human trafficking on their properties and failed to analyze the rate at which those occurrences changed as a result of implementing human trafficking policies and procedures. Defendants did not establish mandatory and secure reporting mechanisms at the point of sale.

29.     With little to no risk posed to traffickers seeking to use Defendants' rooms as a location to force victims like J.M. to engage in commercial sex against her will, the sex trade continues to thrive at Defendants' branded properties while Defendants reap the benefits.

30.     Plaintiff's injuries are indivisible and cannot be separated. Plaintiff's injuries are the result of continued instances of ongoing violent, traumatizing sexual exploitation.

31.     Defendants are jointly and severally liable for the Plaintiff's damages in this case.

### THE SEX TRAFFICKING OF PLAINTIFF J.M.

32.     J.M. met her trafficker when she was twenty-five (25) years old.

33.     By means of a combination of force, coercion, violence, threats, manipulation, control over identification documents and possessions, forced dependence on illegal substances, and deprivation of basic survival necessities such as, but not limited to, food, water, transportation, shelter, and clothing, J.M. was held captive and sold for sex by her trafficker.

34.     During the time that she was trafficked, J.M.'s trafficker frequently rented rooms at the Defendants' hotel locations because the rooms provided convenient, anonymous, and relatively central locations for "johns "who would pay to engage in sex with J.M.

35.     Throughout her trafficking, J.M.'s trafficker connected with "johns" by posting or causing to be posted advertisements on websites like Escort Review and Red Book advertising for J.M.'s availability for commercial sex. J.M.'s trafficker posted many of these advertisements and had conversations with "johns" while connected to Defendants' Wi-Fi.

-11-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

36.     J.M. was forced to have sex with multiple "johns" every day she was trafficked in Defendants' hotels.

37.     While under the coercive control of her trafficker, J.M. was imprisoned in hotel rooms rented by her trafficker and forced to have sex for money. During that time, J.M. was trafficked in the following hotels:

        a.  Stockton Rodeway Inn by Choice located at 339 S. Wilson Way, Stockton, CA 95205, living out of this location, from approximately February 2012 to April 23, 2012; and

        b.  Stockton RRI by Red Roof located at 1707 W Fremont Street, Stockton, CA 95203, staying on a rotating basis, weeks at a time, from approximately February 2012 to April 23, 2012.

38.     During the time she was trafficked, J.M.'s trafficker constantly shuffled her back and forth among hotels, often visiting the same hotels repeatedly for various intervals.

39.     While at the Defendants' hotels, J.M.'s trafficker violently attacked, beat her, and psychologically tormented her by withholding food and water, all to ensure that she could not escape. On one occasion, J.M.'s trafficker beat her with a dog chain and J.M. suffered severe injuries requiring medical attention.

40.     In addition to threatening to harm J.M., her trafficker also threatened to kill and harm J.M.'s family members.

41.     J.M.'s trafficker forced her to check in using identification with her real names at Defendants' hotels.

42.     During her captivity at Defendants' hotels, J.M. was raped, continuously abused physically and verbally, malnourished, psychologically tormented, kidnapped, and imprisoned in Defendants' brand hotels listed above.

-12-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

43.     At the above-listed hotels, J.M. encountered the same staff on multiple occasions. Defendants' staff would have seen the signs of J.M.'s deterioration brought on by the abuse perpetrated by her trafficker, including bruising and physical and verbal abuse occurring in public areas of Defendants' properties as well as signs of malnutrition and poor health.

44.     J.M.'s trafficker followed a repetitive and routine procedure during stays at the Defendants' hotels and Defendants knew or should have known of J.M.'s trafficking because of a variety of factors detailed below:

### THE SEX TRAFFICKING OF J.M. AT THE STOCKTON RODEWAY INN

45.     Plaintiff J.M. was subjected to sex trafficking at the Choice-branded, Stockton Rodeway Inn located at 339 S. Wilson Way, Stockton, CA 95205.

46.     J.M. and her trafficker stayed at the Stockton Rodeway Inn by Choice from approximately February 2012 and April 23, 2012, living at this location for the entire period.

47.     The Stockton Rodeway Inn by Choice staff witnessed J.M. being escorted by her trafficker at all times. J.M. was never left alone and her trafficker controlled her identification documents, possessions, and money.  Each time J.M. interacted with the hotel staff, it was readily apparent that she was under the control of her trafficker.

48.     On one occasion at the Stockton Rodeway Inn, a member of the cleaning staff heard J.M.'s trafficker and two other people beat her up in a hotel room and then witnessed J.M.'s trafficker drag her down the hallway and into a different room. In the second room, J.M.'s trafficker continued to beat her while the window was open. Later, the cleaning staff member, who was previously in the hallway, came to the room to ask if they needed the room cleaned. The staff member did not inquire about J.M.'s safety or report the incident to security.

49.     The same day, J.M.'s friend who was also at the Stockton Rodeway Inn by Choice reported this incident to the front desk. However, the hotel staff allowed J.M.'s trafficker to remain at the hotel and the police were never called.

50.     On multiple occasions at the Stockton Rodeway Inn by Choice, J.M. was beaten by her trafficker in public areas of the hotel, including the stairs and the parking lot, which were in full view of the front desk and lobby. J.M and her trafficker got into many loud altercations which resulted in yelling and sounds of abuse like beatings, banging, crying, and screaming for help.

51.     The staff at the Rodeway Inn by Choice routinely received guest complaints related to the loud noises coming from J.M. and her trafficker's room. The hotel staff came to their room on various occasions requesting they keep the noise level down. On a few occasions, the hotel staff asked J.M. and her trafficker to leave. Sometimes, J.M.'s trafficker would go down to the front desk and convince the staff to let them stay in their room.

52.     During one stay at Rodeway Inn by Choice, J.M. saw her trafficker in the parking lot of the hotel talking with the police.

53.     Furthermore, each stay at the Stockton Rodeway Inn by Choice resulted in several consistent red flags, including, but not limited to: excessive requests for towels and linens; cash payments for rooms; paying for extended stays on a day-to-day basis;  unusual numbers of used condoms in the garbage bins; obvious signs of illegal drug use; rooms requested away from other guests; lots of male visitors coming in and out of J.M.'s room; large numbers of male visitors asking for J.M. and her trafficker at the front desk; physical abuse in public spaces; loud noises of abuse or other emergency audible to the hotel staff and other guests; J.M. and other victims soliciting customers or "johns" on hotel grounds and in the lobby; visible signs of prior physical abuse; and yelling, fighting, and other altercations.

-14-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

54.     J.M. was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Stockton Rodeway Inn by Choice.

55.     These red flags were open and obvious to anyone working at the Stockton Rodeway Inn by Choice and lasted continuously for months.

**THE SEX TRAFFICKING OF J.M. AT THE STOCKTON RRI**

56.     Plaintiff J.M. was subjected to sex trafficking at the Red Roof branded Stockton RRI located at 1707 W Fremont Street, Stockton, CA 95203.

57.     J.M. and her trafficker stayed at the Stockton RRI by Red Roof from approximately February 2012 to April 23, 2012 staying frequently for weeks at a time.

58.     After observing J.M., the other victims, and their trafficker, the Stockton RRI by Red Roof  hotel staff told J.M.'s trafficker to keep the trafficking discreet and agreed to place them in a room in the back of the building each time they stayed so as to not disturb the "regular" customers.

59.     J.M. and the other victims who were being trafficked with her were regularly forced to solicit "johns" on the hotel grounds, including both from the Stockton RRI by Red Roof lobby and the parking lot.

60.     On numerous occasions, the Stockton RRI by Red Roof security guards would tell the "johns" coming in and out of J.M.'s room to "hurry up." The security guards would also threaten to call the police. However, they never involved law enforcement or asked if J.M. or the other victims needed help.

61.     J.M and her traffickers got into many loud altercations in their hotel room which resulted in yelling and sounds of abuse like beatings, banging, crying, and screaming for help.

62.     Further, each of J.M.'s stays at the Stockton RRI by Red Roof resulted in several consistent red flags, including, but not limited to: cash payments for rooms; paying for extended

-15-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

stays on a day-to-day basis;  unusual numbers of used condoms in the garbage bins; obvious signs of illegal drug use; rooms requested away from other guests;  lots of male visitors coming in and out of J.M.'s  room; large numbers of male visitors asking for J.M. and her trafficker at the front desk; loud noises of abuse or other emergency audible to the hotel staff and other guests; J.M. and other victims soliciting customers or "johns" on hotel grounds and in the lobby; women wearing clothing inappropriate for the weather; and visible signs of prior physical abuse.

63.     J.M. was repeatedly raped and otherwise sexually abused hundreds and hundreds of times at the Stockton RRI by Red Roof.

64.     These red flags were open and obvious to anyone working at the Stockton RRI by Red Roof for months.

## DEFENDANTS RECIEVED A BENEFIT FROM PARTICIPATING IN THE HARBORING AND ADVERTISING OF J.M. FOR THE PURPOSE OF SEX TRAFFICKING

65.     Defendants profited from the participation in the venture of harboring J.M. for the purpose of sex trafficking. Defendants rented rooms that were used to harbor J.M. for the purpose of being forced to engage in commercial sex.

66.     Defendants were the primary facilitator or participant in the renting of rooms, including the rooms that were used to harbor J.M.

67.     Defendants controlled booking and payment processing for the renting of rooms at their branded properties. Defendants required their branded properties to use software operated and controlled by the Defendants for room booking and reservations, credit processing for payments for room rentals, and property management. In addition, Defendants fixed the price of room rentals at their branded properties. Thus, every time J.M. and her trafficker rented a room

from Defendants, the reservation, payment information, and guest reservation data were processed through Defendants' software platforms for room rentals.

68.     Defendants acquired valuable customer data when it provided Wi-Fi to customers including J.M.'s trafficker, thereby participating in the venture of advertising J.M. for the purpose of sex trafficking online. Defendants controlled policies and procedures relating to Wi-Fi, information technology, and the collection of guest web browsing data at their branded properties. Defendants required their branded properties to use specific Wi-Fi service providers and to store their guest data on Defendants' centralized data platforms. Defendants had direct access to guest data through their centralized data management platforms. Defendants used this valuable guest data for marketing purposes and also retained data to sell to third parties. Thus, J.M.'s trafficker connected to Wi-Fi through the service providers Defendants require their branded properties to use. Each time J.M.'s trafficker connected to Defendants' Wi-Fi, her trafficker's web browsing data was collected and retained on Defendants' data management platforms.

69.     Defendants benefited from the steady stream of income that J.M.'s trafficker and "johns" bring to their hotel brands. Defendants profited from each and every room that J.M.'s trafficker and customers rented where J.M. was harbored and maintained for the purpose of sex trafficking.

70.     In addition, Defendants profited from data collected each and every time J.M.'s trafficker and customers used Defendants' Wi-Fi to advertise and solicit J.M. for commercial sex.

## DEFENDANTS DIRECT LIABIITY UNDER THE TVPRA

71.     A reasonably diligent corporation, armed with the knowledge and data available to Defendants, would have recognized the issue of human sex trafficking and implemented policies and procedures that, if followed, would have identified the instant allegations of J.M.'s trafficking.

-17-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

72.     Defendants are aware that the hospitality industry is a major life source of the human trafficking epidemic both in the U.S. and abroad.[10] The United Nations,[11] international non-profits,[12] and the U.S. Department of Homeland Security,[13] have documented this well-known epidemic of human trafficking for years and brought particular attention to the indispensable role of hotels. Defendants cannot help but be aware of the public outcry against human trafficking, especially when so much of the uproar surrounds their industry.For example, in 2004 End Child Prostitution and Trafficking ("ECPAT-USA") launched the Tourism Child-Protection Code of Conduct (the "Code") in the United States, identifying the steps companies would need to take to prevent child sex trafficking. ECPAT-USA identified hotel-specific best practices for preventing sex trafficking, such as: (1) not renting by the hour; (2) not permitting cash payments; (3) monitoring online sex ads such as Craigslist and Backpage for their hotel name and pictures of the rooms; (4) changing Wi-Fi passwords in rooms and cafes regularly; (5) watching for a trend of visitors to the same room; (6) being aware of rooms with excess condoms, lubricants, and towels; (7) requiring all visitors to be logged, including guest name, visitor name, arrival time, departure time, and room number.

73.     Further, nationwide campaigns have recognized the issue of human trafficking in the hotel industry and the lack of internal policies to address the issue and took initiative as early

---

[10] Giovanna L. C. Cavagnaro, *Sex Trafficking: The Hospitality Industry's Role and Responsibility*, CORNELL UNIVERSITY SCHOOL OF HOTEL ADMINISTRATION (2017), http://scholarship.sha.cornell.edu/honorstheses/3.

[11] *Global Report on Trafficking in Persons,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (2020), 84 8available at https://www.unodc.org/documents/data-and-analysis/tip/2021/GLOTiP_2020_15jan_web.pdf; See also *We must act together to fight exploitation and human trafficking in tourism, say United Nations and international partners,* UNITED NATIONS OFFICE ON DRUGS AND CRIME (April 24, 2012) available at https://www.unodc.org/unodc/en/press/releases/2012/April/we-must-act-together-to-fight-exploitation-and-human-trafficking-in-tourism-say-united-nations-and-international-partners.html

[12] The Polaris Project and ECPAT-International have published extensive reports and professional toolkits on human trafficking in the hospitality industry for years.

[13] Human Trafficking and the Hospitality Industry, U.S. DEPARTMENT OF HOMELAND SECURITY (2020), available at https://www.dhs.gov/blue-campaign/hospitalityindustry; Hospitality Toolkit, U.S. DEPARTMENT OF HOMELAND SECURITY (2016), available at https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf

-18-

as 1997 with the United Nations Blue Heart Campaign[14] and domestically in 2010 with the Department of Homeland Security's Blue Campaign.[15] These efforts sought to educate both the public and private sectors on identifying and combatting human trafficking, including the hospitality industry and both campaigns released free online resources and toolkits publicly accessible to any entity concerned with human trafficking.

74.   Defendants, on information and belief, have access to individual hotel location do-not-rent ("DNR") lists that often list reasons for the refusal to rent, including the suspicion of human trafficking.  The Defendants nevertheless do not share such information with other hotel locations, thereby preventing other of their hotel locations from acting to protect the victims of such suspected human trafficker.

75.   Defendants also have access to public police reports, news reports and internal reports generated by customers and employees, regarding sex trafficking at their own hotel locations in particular.

76.   Defendants have access to reviews left by guests on websites such as www.tripadvisor.com, www.yelp.com, www.google.com, and others, wherein guests frequently complain about the prevalence of obvious prostitution, hearing physical violence by pimps, and other signs of human trafficking.

A brief examination of just a handful of examples for each Defendant suffices to show the extraordinary frequency with which the Defendants have long received and continue receiving evidence and reports that human trafficking runs rampant at their hotel locations: **CHOICE**

      a.   Regarding a 2014 stay at the Stockton Rodeway Inn by Choice, a customer said: "I went to this Rodeway Inn . . . and while I was walking to the managers

---

[14] *The Blue Heart Campaign,* UNITED NATIONS (2022),
https://www.unodc.org/blueheart/#:~:text=The%20Blue%20Heart%20Campaign,help%20prevent%20this%20heinous%20crime.
[15] *DHS Blue Campaign Five Year Milestone*, DEP'T OF HOMELAND SECURITY (Jul. 22, 2015),
https://www.dhs.gov/blog/2015/07/22/dhs-blue-campaign-five-year-milestone.

SECOND AMENDED COMPLAINT - CASE NO. 2:22-cv-00672-KJM-JDP

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

office I was asked by a female with a low cut skirt on if I would be interested in entertaing her room. I told her no that im just here to go get my money back.. she then walked over to her car with a aka GORILLA PIMP pointing at me.. I was very disturbed and didn't know what to do!! . . .”

### RED ROOF INN

b.  Regarding a June 2012 stay at the Stockton RRI by Red Roof, a customer said: “WORST HOTEL I'VE EVER STAYED IN MY LIFE!!!!! My family took a road trip from southern California to Yosemite. We usually take one big vacation a year. We booked our hotel in advance, we had 3 rooms. Because of our road trip we didn't arrive until 10 pm that night when we arrived there were about 5 prostitutes outside with pimps. We were so frightened we drove around for 30 minutes trying to cancel our stay and because it was after 6 pm they wouldn't allow us to cancel. I'm positive the owner has some sort of deal with the drug dealers and pimps there is no way he doesn't know this is going on. They don't even try to hide it!. After delegating with our families (it was 15 of us in a 15 passenger van) we were so exhausted we decided to sleep a couple of hours and leave at dawn. I was so afraid we would get our van stolen I parked it in front of the office and took my 1 year old daughters car seat in the room with me. I was so upset by this time I went complain at the front desk and of course the receptionist said the manager was not there and there was nothing she could do with out his approval. That she would try to give us a 20.00 discount, which of course we never saw. IF YOU VALUE YOUR LIFE STAY AWAY FROM THIS PLACE AT ALL COSTS!!!!!!!”

c.  Regarding a November 2012 stay at the Stockton RRI by Red Roof, a customer said: “Horrible, was scared for our lives. My mother and I were moving from washington to california and after all day driving we finally found a hotel online, the red roof inn. When we got there it seemed okay right after we

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

checked in two men came out and just kept watching us, and one starts following us. We decided to go to dinner but felt so uncomfortable we brought our electronics with. While we were gone we did more research and the day before someone had been murdered there. We came back and found two men around one of our vehicles and what looked like casing it. During the short time there we also saw drug dealing and prostitution in the parking lot. We went back to the room and looked around the sheets were dirty the bathroom was gross. So we decided we'd leave and because after 6pm we couldnt get a refund. We spent the night sleeping in our car at a rest stop where we felt safer at than that hotel. Do not stay here! Worst mistake!"

77.     Defendants have made a public commitment to combat human trafficking, and thus, are aware that trafficking is a common problem in the hospitality industry. Defendants should have been aware of the benefits they were receiving from the human trafficking occurring at the locations where J.M. was trafficked given Defendants access to information, such as police reports, news articles, complaints, and negative reviews regarding the specific locations and surrounding areas.

78.     Defendants held meetings among their executives, directors, and managers discussing human trafficking at its branded hotels. Defendants also communicated with organizations like ECPAT, Polaris as well as trade organizations, such as the American Hotel & Lodging Association regarding human trafficking prevention in the hotel industry.

79.     Defendants discussed, developed, and implemented uniform policies and procedures to identify, prevent and mitigate the risk of human trafficking occurring at their properties, including the hotels where J.M.  was trafficked. These policies included ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, alerts to hotels in high-risk areas or in proximity to high-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

-21-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

risk events, and field-based associates who visit hotels specifically to discuss human and sex trafficking issues.

80.     Pursuant to these policies, upon information and belief, Defendants regularly review and monitor criminal activity, police reports, news articles, suspicious disturbances at branded properties, indices of human trafficking, and other information that would suggest human trafficking and prostitution at their branded properties or in the surrounding areas, including both the Stockton Rodeway Inn by Choice and the Stockton RRI by Red Roof. Upon information and belief, Defendants required all owners, property management, and employees to report this activity to Defendants' corporate executives and upper-level management.

81.     Upon information and belief, Defendants regularly review and monitor complaints and reviews of its branded properties, including both the Stockton Rodeway Inn by Choice and the Stockton RRI by Red Roof, that reference human trafficking, prostitution, and other illegal activities, posted on various online review websites such as yelp.com, Travelocity, and Google, among others.   Upon information and belief, Defendants required all owners, property management, and employees to report these complaints and reviews to Defendants' corporate executives and upper-level management.

82.     Moreover, Defendants required their branded properties to use centralized data systems, that were operated and owned by Defendants at the corporate level, for reservations and booking, credit processing, property management, Wi-Fi and information technology, incident reporting, and others. Defendants repeatedly collected data on J.M., her trafficker, and her "johns" from their centralized data collection and management platforms, including but not limited to room reservation patterns; identification and payment information; data from websites visited on Wi-Fi; complaints and disturbances during stays; extra requests for towels and linens; room cleaning requests; and other data associated with J.M. and her traffickers many stays. Defendants had direct

-22-

access to this data through the branded properties required use of Defendants' centralized data systems.

83.     Defendant's employees witnessed the obvious signs of J.M.'s trafficking including signs of abuse, frequent male visitors coming in and out of the room, condoms in the trash, loud yelling and fighting, and others. The branded property owners, property management, and employees, including those at the Stockton Rodeway Inn by Choice and the Stockton RRI by Red Roof, would have reported suspected red flags of human trafficking to Defendants' corporate executives and upper-level management pursuant to Defendants' human trafficking policies and procedures.

84.     As alleged herein, Defendants were aware of J.M.'s trafficking from both corporate-wide policies that required Stockton Rodeway Inn by Choice and the Stockton RRI by Red Roof owners, property management, and employees to report customer data and other indicators of trafficking including suspicious criminal activity, web data indicating use of commercial sex websites, and data associated with reservations to Defendants. Defendants were also aware of J.M.'s trafficking from the data that Defendants directly gathered from their centralized data management systems operating at the Stockton Rodeway Inn by Choice and the Stockton RRI by Red Roof.

85.     Despite having access to all this information for years, Defendants failed to take reasonable measures to stop benefitting from sex trafficking occurring in their hotels. If Defendants had taken more exhaustive measures, Defendants would not have profited from J.M. and other victims like her being trafficked at their locations.

          a.   Defendants failed to take any steps to alert the authorities, properly intervene in the situation, or take reasonable security steps to stop reaping the benefits of sexual exploitation on their properties. Defendants maintained their

**Levin Simes Abrams, LLP**
**1700 Montgomery Street, Suite 250**
**San Francisco, CA  94111**

-23-

deficiencies to maximize profits by: Failing to mandate and minimizing costs of training employees and managers on how to spot the signs of human trafficking and sexual exploitation;

b.   Lowering operating costs and management costs by failing to analyze the data they received regarding criminal activity and customer reviews that indicated sex trafficking was occurring and taking the steps necessary to remedy the problems;

c.   Collecting and utilizing massive amounts of data from all of their branded locations for marketing and other profit-driven purposes but failing to utilize this same data to combat sex trafficking in their hotels;

d.   Failing to refuse room rentals, or report guests to law enforcement, in order to maximize the number of rooms occupied and the corresponding rates, even if the rooms rented were to sex trafficker or buyers;

e.   Failing to monitor and track guest wireless network use for illicit commercial sex purposes or digital activity associated with human trafficking.

f.   Failing to institute proper security measures, including, but not limited to, employing qualified security officers or appropriate cybersecurity measures to actively combat human trafficking and sexual exploitation; and

g.   Failing to use its power as a parent company hold the franchisees accountable for contributing to the prevalence of sex trafficking on their properties.

86.    As a direct and proximate result of these egregious practices on the part of the Defendants, J.M. and victims of sex trafficking and exploitation like her, have been permanently injured and damaged physically, emotionally, psychologically, and financially.

-24-

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

## DEFENDANTS' CONTROL OVER THEIR BRAND HOTELS AND VICARIOUS LIABILITY

87.     Upon information and belief, it is a standard practice in the hospitality industry, followed by both Defendants, for parent companies to set exacting brand quality standards reaching everything from the temperature at which coffee shall be served, to the number of pillows that shall be placed on each bed, to the types of funds accepted, to when, where and how guests should be greeted.

88.     Defendants provide their branded properties with signage on and in front of the building intended to assure customers that, if they check into that hotel, they can expect an experience consistent with the standards of the parent hotel brand.  The same brand is emblazoned on everything in the hotel, from the pens on the bedside table to the staff uniforms at the front desk.

89.     Defendants provide their branded properties brand name recognition, a marketing campaign, and hotel listings in the Global Distribution System (GDS) and other online travel agency databases, as well as with access to their brand-wide central reservation systems, 800 numbers, revenue management tools, brand loyalty programs, and company websites.  Thus, booking and room reservations are to a substantial extent controlled by Defendants.[16] Defendants see booking and reservation trends, including for those branded hotels where Plaintiff was trafficked.[17]

---

[16] Ellen Meyer, *The Origins and Growth of Franchising in the Hotel Industry*, LODGING MAGAZINE (Apr. 10, 2018), https://lodgingmagazine.com/the-origins-and-growth-of-franchising-in-the-hotel- industry/.
[17] Where a branded hotel allows cash to be accepted for payment, monitoring and auditing these trends are important to identifying locations where criminal activity and commercial sex trafficking may be occurring.

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

90.     Upon information and belief, Defendants require its branded hotel properties to use a property management system, which is linked to Defendants' corporate network and data center, for, among other things, receiving reservations, and processing credit card transactions.

91.     Upon information and belief, per the relevant franchise agreements,[18] Defendants may enforce their brand standards by means of periodic inspections of their brand hotel locations, backed up with the ultimate threat of termination of the franchise agreement.

92.     Defendants maintained and controlled the hotels locations where J.M. was trafficked so as to establish a direct liability cause of action. Additionally and or alternatively, Defendants maintained control in relation to the hotels at issue sufficient to establish vicarious or agency liability under the TVPRA.

## CHOICE

93.     Choice exercises day-to-day control over the Stockton Rodeway Inn by Choice and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Choice implements and retains brand hotel control over, including control over the Stockton Rodeway Inn by Choice and, as either direct subsidiaries or under the terms of its franchise agreements.

94.     Upon information and belief, Choice controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to:

        a.   Requiring the branded locations to use Choice's property management system;

        b.   Gathering reports of data generated by branded locations including

---

[18] Most franchise disclosure documents, which outline the policies and procedures of franchise agreements, can be accessed publicly for free by making an account on https://fddexchange.com/view-fdd-docs.

SECOND AMENDED COMPLAINT - CASE NO. 2:22-cv-00672-KJM-JDP

reservation, payment, and occupancy information through Choice's centralized systems;

c.  Requiring branded locations to keep audit reports and other records;

d.  Conducting regular inspections for compliance with franchise agreement terms and Choice's rules and regulations;

e.  Providing marketing requirements and standardized marketing services for the branded locations;

f.  Regulating the all the policies, procedures, and standards of the branded properties from the front desks to the bathrooms;

g.  Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

h.  Requiring branded locations to install Choice's data transport system to share data with Choice corporate;

i.  Providing training and orientation materials for branded property staff;

j.  Requiring branded locations to make modifications to the branded properties upon Choice's request and to refrain from make substantial changes to the branded property without Choice's permission;

k.  Regulating the rates for room rentals; and

l.  Insurance coverage requirements.[19]

95.  Choice manages corporate and branded property training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies

---

[19] See e.g. Comfort Inn 2020 Franchise Disclosure Document, https://fddexchange.com/view-fdd-docs/comfort-inn-2020-fdd-franchise-information-costs-and-fees/

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

published and communicated via property management systems with back-end management by Choice.[20]

96.     Choice controls uniform and required reservation, marketing, customer support systems and loyalty programs at its branded hotels through national press releases, newsletters, emails, announcements on Choice's website, and mentions across its corporate media channels.[21]

97.     Choice mandates usage of a cloud-based centralized property management system called ChoiceADVANTAGE to its branded locations.[22]

98.     Choice controls all hotel reservations made across its branded locations on its centralized reservation system called Choice Edge.[23]

99.     Through its national sales team, Choice controls the credit processing system and the centralized direct billing at its brand hotels, including the Stockton Rodeway Inn by Choice.[24]

100.    Choice gathers data from its customers including names, payment information, reservation history, browsing data, other details associated with their stay for promotional and guest safety reasons.[25]

101.    Upon information and belief, Choice requires its hotels to carry Wi-Fi internet access with certain cybersecurity measures in place which gives Choice the ability to access, monitor, and harvest that internet data.

102.    Under the guise of maintaining its "brand standards," Choice also forces its branded hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well

---

[20] *See* e.g. *Why Choice?,* CHOICE, https://choicehotelsdevelopment.com/why-choice (last visited Jun. 9, 2022). id. ("We've taken our teams' collective knowledge of hotel operations, technology, service and leadership, and developed the tools and resources our owners use every day to help run their businesses.").
[21] *Id.*
[22] *Connect the world through the power of hospitality*, CHOICE, https://www.choicehotels.com/about
[23] *Supra* n 101
[24] *Id.*
[25] Choice Hotels International, Inc. *Privacy & Security Policy,* https://www.choicehotels.com/legal/privacy-policy

-28-

as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[26]

103.    While Choice requires branded properties to comply with its corporate policies relating to Security and Guest Safety, Human Rights, Ethics, Corporate Governance, and compliance with the law, it fails to does not provide the branded properties with the authority or tools to achieve such compliance. [27]

h.    Choice has publicly promoted its policies to combat human trafficking at its branded properties: In 2015, Choice launched an online training module entitled "Combatting Human Trafficking in Your Hotel" for its management and staff.[28] According to Choice, the training program has been completed nearly 30,000 times and is directed at local hotels in order to "educate management and staff at…franchised hotels."[29]

i.    Choice also makes the Blue Campaign Toolkit available to management and staff of franchised properties.[30]

j.    In addition to the training Choice is in ongoing communication with its local hotels by including articles about human trafficking in newsletters, announcements at annual conferences, and alerts to hotels in high-risk areas or in proximity to high-risk events.[31]

k.    Choice even brags that it has "field-based associates" who visit hotels

---

[26] *See e.g.*, *Convert an Existing Hotel*, CHOICE HOTELS, https://choicehotelsdevelopment.com/ convert-a-hotel/#upscale (last visited Jun. 9, 2022).
[27] Choice claims to "strive to conduct [its] business operations free from violations of human rights" *See Human Rights Policy*, CHOICE HOTELS, https://www.choicehotels.com/about/responsibility/human-rights-policy (last visited Jun. 6, 2022).
[28] *Id.*
[29] *Id.*
[30] *Id.*
[31] *Id.*

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

specifically to discuss human trafficking and commercial sex trafficking.[32]

## RED ROOF

104.    Red Roof exercises day-to-day control over the Stockton RRI by Red Roof and its other brand hotels through centralized corporate systems, training, policies, and brand standards. Red Roof implements and retains brand hotel control, including control over the Stockton RRI by Red Roof, as either direct subsidiaries or under the terms of its franchise agreements.

l.    Red Roof controls the operations of its branded properties through a variety of means enforced through franchise agreements and related contracts, including but not limited to: Providing the software, hardware, and platforms where data and information is shared with Red Roof corporate;

m.    Providing reservation platforms where payment modes and suspicious reservations would suggest trafficking;

n.    Providing training and education to branded hotels through webinars, seminars, conferences, and online portals;

o.    Providing and controlling customer review and response platforms;

p.    Hosting online bookings on Red Roof's domain;

q.    Requiring branded hotels to use Red Roof's customer rewards program;

r.    Requiring branded hotels to use Red Roof's property management software;

s.    Requiring branded hotels to use approved vendors for internet services or other requirements for Wi-Fi access and filtering;

t.    Providing IT support for all property management systems, owned, operated, and required by Red Roof;

u.    setting employee wages;

[32] *Id.*

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

v.   sharing profits;

w.   standardizing training methods for employees;

x.   building and maintaining the facility in a manner specified by the owner;

y.   standardized or strict rules of operation;

z.   regular inspection of the facility and operation by the owner; and

aa.  fixing prices.[33]

105.  Red Roof manages corporate training, policies, and procedures on human trafficking, cybersecurity, guest preferences, reward programs, internet access, hotel furniture, amenities, food and beverage, cleanliness, and/or other hotel brand related policies published and communicated via property management systems with back-end management by Red Roof.[34]

106.  Red Roof controls uniform and required reservation, marketing, customer support systems and loyalty programs at its brand hotels, including the Stockton RRI by Red Roof.[35] Red Roof also advertises its brand hotels through national press releases, newsletters, emails, announcements on redroof.com, and mentions across its corporate media channels.[36]

107.  Red Roof requires its hotels to use a consolidated IT system and database for property management, credit processing and centralized billing, as well as problem-tracking to ensure all problems are resolved promptly and that emergencies are escalated.[37]

---

[33] *See* 2021 Franchisee Disclosure Document, https://franchimp.com/?page=pdf&f=105990_2021.pdf

[34] *See e.g.*, *Brand Support*, RED ROOF, https://www.redrooffranchising.com/brand-support (last visited Jun. 9, 2022) ("We support our franchisees with extensive on-site training.  On everything from helping with pricing strategy and operational expense management, to assistance with marketing and operation programs…Our cost-effective sourcing solutions, efficient technology support, and incredible property management system add even more value to your Red Roof franchise.")

[35] *Id.*

[36] *Brand Marketing*, RED ROOF, https://www.redrooffranchising.com/brand-marketing (last visited Jun. 9, 2022) ("From your grand opening to being fully operational, our team helps you market your property every step of the way. We provide property-specific design services for print materials—like flyers and rack cards—and even help with billboards, transit advertising, and other local promotional needs.")

[37] *See* Red Roof Franchising, available at https://www.redrooffranchising.com/technology; *See also Sales Team*, RED ROOF, https://www.redrooffranchising.com/sales-team (last visited Jun. 9, 27 2022) (corporate Red Roof employees provide brand staff with "regional events, webinars, and in-person visits" alongside training, other support, and "RediBill® Brand-Wide Direct Billing" centralized billing program).

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

108.    Red Roof boasts of its "Streamlined Technology" and "Shared Success" with its brand hotels. To "make operations as easy and seamless as possible," Red Roof controls "a fully integrated database" which its brand hotels must use to access customer data and reservations, among other information shared system-wide between Red Roof and its brand hotels.[38] Red Roof's privacy policy states that it collects information such as contact information, demographics, financial information, government-issued identification numbers, accommodation preferences, location, IP addresses, and social media content from hotel guests.[39]

109.    Red Roof also sets and controls Wi-Fi qualifications and/or Wi-Fi qualified service providers, language and policy used on internet landing pages, thresholds for cybersecurity, filtering and/or other guest internet protections, systems used to monitor customer reviews and responses, and other systems related to the daily operations at its brand hotels, including the Stockton RRI by Red Roof.[40]

110.    In addition, through an integrated corporate marketplace, Red Roof mandates the use of specific vendors and suppliers for the purchase of goods and services at its brand hotels, including the Stockton RRI by Red Roof.[41]

111.    Under the guise of maintaining its "brand standards," Red Roof forces its brand hotels to frequently undertake expensive renovations, remodeling, and construction efforts, as well as purchase mandated products with limited warranties which are shortened by such onerous and exorbitant requirements.[42]

---

[38] *Technology*, RED ROOF, https://www.redrooffranchising.com/technology (last visited Jun. 9, 2022); see also *Privacy Policy*, RED ROOF, https://www.redroof.com/privacy-policy (last visited Jun. 9, 2022).
[39] *Id.*
[40] *See* sigmawifi Red Roof Inn Case Study, *available at* https://www.sigmawifi.com/red-roof-inn-nh-case-study/
[41] See *Operational Support Procurement Services*, RED ROOF, https://www.redrooffranchising. com/operational-support (last visited Jun. 6, 2022).
[42] *See Design and Construction,* RED ROOF, https://www.redrooffranchising.com/design-and-constuction (last visited Jun. 9, 2022).

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111

112.     Red Roof posts job openings for its branded properties on its central career positing website.[43] Red Roof provides benefits to employees of its branded properties, and upon information and belief controls the terms and conditions of their employment.[44]

113.     Red Roof has publicly promoted its policies to combat human trafficking at its branded properties:

> bb. In a press release, Red Roof's president George Limbert said "We encourage all our partners and peers in travel and hospitality to join us and stand by ECPAT-USA in the fight against human trafficking.[45]

> cc. In 2018, Red Roof instituted a policy to give staff "panic buttons" to alert security on incidents of sexual assault, human trafficking, and other emergencies.[46]

> dd. According to ECPTA-USA, Red Roof has only trained a mere 288 of its staff across all of its U.S. properties to date.[47]

### CAUSES OF ACTION

### COUNT 1: 18 U.S.C. § 1595 ("TVPRA")
### (AGAINST ALL DEFENDANTS)

114.     Plaintiff incorporates each foregoing allegation.

115.     Plaintiff is a victim of sex trafficking within the meaning of 18 U.S.C. § 1591(a) and is entitled to bring a civil action under 18 U.S.C. §1595.

---

[43] *See* https://www.redroofjobs.com/
[44] *Id.*
[45] See e.g. Ed Brock, Red Roof Donates $10,000 TO FIGHT HUMAN TRAFFICKING (2022), https://www.asianhospitality.com/red-roof-donates-10000-to-fight-human-trafficking/
[46] Dee-Ann Durbin, *Major Hotels giving panic buttons to staff nationwide,* CHICAGO TRIBUNE, https://www.chicagotribune.com/business/ct-biz-hotel-panic-buttons-20180906-story.html
[47] *Member Information: Red Roof Inns,* CODE OF CONDUCT (2022) https://thecode.secure.force.com/apex/publicprofile2?id=0019000001le7v1AAA

116.   Defendants' acts, omissions, and commissions, taken separately and/or together, outlined above, constitute a violation of 18 U.S.C. § 1595. Specifically, Defendants had a statutory obligation not to benefit financially or receive anything of value from a venture that they knew, or should have known, engaged in violating the TVPRA. At all relevant times, Defendants breached this duty by facilitating violations of the TVPRA through their participation in the harboring, maintaining, soliciting, and advertising of Plaintiff and her trafficker for the purposes of commercial sex induced by force, fraud, or coercion. Defendants had direct perpetrator level knowledge of the J.M.'s trafficking, as well as constructive knowledge i.e., a reasonably diligent corporation under the circumstances would have known it participated in a venture involved in violation Section 1591.

117.   Defendants benefited as a result of these acts, omissions, and/or commissions by receiving revenue from renting rooms and customer data by providing Wi-Fi to trafficker and customers.. Moreover, on each occasion they received payment for rooms or received payments or kickbacks for internet usage, Defendants directly benefitted from the sex trafficking of Plaintiff when they knew or should have known violations of §1591(a) were occurring. The actions, omissions, and/or commissions alleged in this pleading were the "but for'" and proximate cause of Plaintiff's injuries and damages.

118.   Plaintiff has suffered substantial physical and psychological injuries as the result of being trafficked and sexually exploited at Defendants' hotels and properties.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment as follows:

a.   Awarding Plaintiff all available compensatory damages for each cause of action, including but not limited to past and future medical expenses; past and future lost wages and loss of earning capacity; past and future emotional distress;

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA  94111

consequential and/or special damages; all available noneconomic damages, including but not limited to pain, suffering, and loss of enjoyment of life;

b.  Disgorgement of profits obtained through unjust enrichment;

c.  Restitution;

d.  Statutory and/or treble damages, where available;

e.  Punitive damages;

f.  Attorneys' fees and expenses;

g.  The costs of this action;

h.  Pre- and post-judgment interest; and

i.  Any other relief the Court or jury deems appropriate.

I.      **JURY DEMAND**

Plaintiff hereby demands a trial by struck jury.

Dated: November 30, 2022

Respectfully submitted,

*/s/ Steven C. Babin, Jr.*
Steven C. Babin, Jr. (0093584)
Jennifer J. El-Kadi (00100660)
Kristina Aiad-Toss (0101336)
Morgan Harper (*pro hac vice
forthcoming*)
**Babin Law, LLC**
65 East State Street, Suite 1300
Columbus, Ohio 43215
T: 614-761-8800
E: steven.babin@babinlaws.com /
Jennifer.elkadi@babinlaws.com /
Kristina.aiad-toss@babinlaws.com

Levin Simes Abrams, LLP
1700 Montgomery Street, Suite 250
San Francisco, CA 94111